# CHARLESTON.

AMMONS *et al.* v. SOUTH PENN OIL CO.

Submitted September 9, 1899.—Decided March 31, 1900.

1. EQUITY—*Doctrine—Account.*
    It is a well-established doctrine of courts of equity that it

is improper to order an account merely to afford the plaintiff an opportunity to establish by testimony the allegations of his bill.   (p. 627).

2.   SALE—*Conditions—Forfeiture—Damages.*

S. purchased of A. seven-eighths of the undivided one-half interest of A. in the oil in and under two hundred and forty-three acres of land, and paid three hundred dollars cash therefor; and, as part of the terms and conditions of sale, S. was to begin to operate, mine, and bore for oil and gas within and under said tract of land, free of cost to A., within sixty days, and complete one well thereon in one year, unavoidable delay and accidents excepted; and, if oil be found thereon in paying quantities, then, after the said first well was completed thereon, S. should immediately commence and drill other wells thereon as should seem necessary to protect the oil and gas in and under the said tract of land, and should also deliver as royalty to the credit of A., free of cost to him, the one-half of the one-eighth of all the oil produced and saved from the said land, in pipe lines or tanks, and pay to him the one-half of three hundred dollars per year for the gas from each and every well drilled thereon, producing gas, the product from which should be marketed. *Held,* that the remedy for violation of said conditions of the sale is not by way of forfeiture of the rights of S. to bore or drill for oil on the land or any part of it, but by an action or proceeding for damages caused by such breach.   (p. 629).

Appeal from Circuit Court, Monongalia County.

Suit by Howard L. Ammons and others against the South Penn Oil Company and others.   Decree for plaintiffs, and defendant oil company appeals.

*Reversed.*

M. F. ELLIOTT, U. N. ARNETT, JR., and A. B. FLEMING, for appellant.

COX, & BAKER for appellees.

MCWHORTER, PRESIDENT:

Daniel Conaway, of Monongalia County, devised to his daughter, Armina Ammons, for the term of her natural life, and at her death to her children (subject however, to a life estate therein, which he devised to his wife, Malinda). a tract of two hundred acres of land in said county, which, on being surveyed, proved to contain two hundred

and forty-three acres. On the 17th day of March, 1891, Malinda conveyed by deed of that date her life estate in said tract of land to her son-in-law, Milton A. Ammons, and her daughter, Armina Ammons, his wife, in consideration of natural love and affection, and the further consideration that the vendees would comfortably support, care for, maintain, and clothe the vendor during the remainder of her life, and give her a decent burial at her death, and erect or cause to be erected over her grave a monument as near like the monument then over the grave of her late husband, Daniel Conaway, as it was possible to get, and retained a lien on said estate so conveyed to secure the comfortable support, caring for, maintenance, and clothing, which was a part of said consideration. By deed of date 27th of May, 1889, said Milton A. Ammons and his wife, Armina Ammons, leased for oil and gas purposes the said tract of two hundred and forty-three acres, in connection with adjoining lands, making in all three hundred acres, more or less, to Charles J. Ford, for the term of five years from the date of the lease, and as much longer as oil or gas should be found in paying quantities, which lease was by Charles J. Ford, by a writing, duly signed and acknowledged, dated July 17, 1889, assigned to the South Penn Oil Company, which lease and assignment were admitted to record in the clerk's office of the county court of said Monongalia County. On the 17th of February, 1892, M. A. Ammons, guardian of Howard L. Ammons, Clarence L. Ammons, Ashley Ney Ammons, Cyrus C. Ammons, Stella M. Ammons, Millard R. Ammons, Early F. Ammons, and Ernest H. Ammons, the infant children of said Armina Ammons, filed his petition in the circuit court, under chapter eighty-three, Code, naming the said infants and the said Armina Ammons, Milton A. Ammons, Malinda Conaway, Charles J. Ford, and the South Penn Oil Company, a corporation, as defendants, and asking for such proceedings as would authorize him to make sale or dispose of the interest of the said infant defendants in their estate in remainder in the undivided seven-eighths of the oil as well as the gas which might be under the said tract of two hundred and forty-three acres of land, together with the right and privilege of the purchaser to enter upon

said tract of land and operate for oil, etc., and for general and special relief. It was ascertained by proper proceedings therein that the infant defendants, children of the said Armina Ammons, who had an estate in remainder in said tract of land, should have and be seised of an estate in *praesenti* of an undivided one-half interest in all the gas and oil in and under the said tract of two hundred and forty-three acres of land; and the court, being of opinion that such division was proper, appointed Charles Powell a special commissioner to sell at either public or private sale the interest of said infants in and to the seven-eighths of the oil and gas, with all proper privileges for producing and securing the same. Said special commissioner made sale of same for the sum of three hundred dollars in cash to the South Penn Oil Company, in addition to paying all the costs of the proceeding and the cost of conveying the same, which sale was confirmed, and Charles Powell appointed special commissioner to convey the same to the South Penn Oil Company, which he did by deed dated February 18, 1892. It is provided in said deed "that, as a part of the terms and conditions of the said sale, the purchaser of the said interest and rights and privileges shall do and perform the following, to wit: To begin to operate, mine, and bore for oil and gas within and under said tract of land free of cost to the said infants or their guardian, within sixty days after the confirmation of the sale hereunder, and complete one well thereon in one year after said confirmation, unavoidable delay and accidents excepted; and, if oil be found thereon in paying quantities, then after the said first well is completed thereon the said purchaser shall immediately commence and drill other wells thereon as shall seem necessary to protect the oil and gas in and under the said tract of land, and shall also deliver as royalty to the credit of the said infants or their guardian, free of cost to them or their guardian, the one-half of the one-eighth of all the oil produced and saved from the said land, in pipe lines or tanks, and pay to the said infants or their guardian the one-half of three hundred dollars per year for the gas from each and every well drilled thereon, producing gas, the product from which is marketed or used off the said premises, and also pay all the damages to

the growing crops by reason of operations. And this conveyance is made on the terms and conditions and subject to the requirements and restrictions of said decrees only. Reference is here made to the said will of record as aforesaid, and to the said decrees and papers in the said cause or proceeding aforesaid, for a full and more perfect description of either said tract of land, and the said oil and gas interests, rights, and privileges, and the terms and requirements of the said decrees."

On the 28th of August, 1895, the said Howard L. Ammons and the other seven named children of Armina Ammons, all infants, by Milton A. Ammons, their next friend, sued out of the clerk's office of the circuit court of Monongalia County their subpoena in chancery, and filed their bill against the South Penn Oil Company, a corporation organized and existing under the laws of Pennsylvania, and Charles Powell, special commissioner, defendants, alleging that the said tract of two hundred and forty-three acres of land is located in what is known as the Doll's Run and Mannington oil field or belt; that the oil is found in said field or belt in a porous sand rock stratum; that, at the time of entering the proceedings and the decrees selling said defendant the seven-eighths interest of plaintiffs in said oil and gas, said land was practically tested and very valuable oil territory, and the same, if it had been properly and fairly developed, and the oil and gas thereunder properly and fairly protected by the drilling of such wells as seemed and were necessary, was worth several hundred thousand dollars for oil purposes; that the defendant oil company is very largely interested and engaged in the oil business in said field or belt, and owns leases for oil and gas purposes on many thousand acres in said belt, and near thereto, and owns and operates very many producing oil wells in said belt, by means whereof it has a very large production of both oil and gas,—and filed with their bill a map, as Exhibit ten, showing the tract accurately, and the courses and distances; alleging that said defendant is the owner of leases for oil and gas purposes on all the lands adjacent and adjoining said tract of two hundred and forty-three acres, and has developed or partially developed said adjacent territory and leases; that, owing to

the nature and porous character of the oil-producing sand rock in that field or belt, a well drilled to that rock will drain and produce the oil from a considerable distance around or away from the place where the well is drilled in the rock, and a number of wells drilled around and close to a given tract of land, such as the said two hundred and forty-three-acre tract, will drain the oil and gas or the greatest part of them from such tract, and leave it practically valueless for oil purposes, unless wells are drilled and operated on such tract in such proximity to the lines thereof as will protect the oil and gas under the same, and prevent the same being drained by the wells of adjoining tracts; alleging that defendant had drilled wells on the adjoining tracts near the line of the tract in controversy, and did not drill wells on said tract opposite thereto, to protect the lines thereof against the drainage of such wells cn the adjoining tracts, as it was required to do under the provisions of its deed; that, up to the time of the commencement of this suit, defendant had not drilled a sufficient number of wells on the tract to remove the oil from the land within a reasonable time, and to protect the lines of said tract against drainage to the wells drilled by defendant on the adjacent tracts; that, to have protected the oil and gas in said tract as was its duty to do, at least thirty wells should have been drilled on said tract, while only about one-half that number had been drilled; that the conditions, terms, requirements, and restrictions contained in the decrees authorizing the sale of plaintiffs' interest, and in the deed conveying the same to defendant, in relation to protecting the oil and gas under said tract of land, were intended and meant to protect the interests of the infant plaintiffs therein, and their royalty, as it would be no pecuniary loss to the defendant company to drain and draw the oil and gas out of and from the said tract of land by means of wells on adjacent lands, and would probably be a saving in the expense of drilling such wells on said tract, as it was required by the said decrees and deed, especially as said defendant company is the owner and operator of the leases and said wells on the adjoining lands, and that for some reason, either of pecuniary interest or otherwise, the defendant had knowingly and wrongfully permitted said tract

to remain unprotected and undeveloped, and had willfully and wrongfully discriminated against plaintiffs and their said royalty interest in the oil and gas in and under said tract of land, and was continuing to do so, to their great prejudice, and, that, in consequence of the failure of defendant to comply with the terms of the decrees and the deed, the plaintiffs had sustained damages to the amount of twenty-five thousand dollars; that about the time of the commencement of the suit the plaintiffs had filed an affidavit, and sued out an order of attachment against the property of said defendant company, which order was placed in the hands of the sheriff of the county to be executed, by which order the sheriff was commanded to attach property of the said defendant sufficient to satisfy the said sum of twenty-five thousand dollars claimed by plaintiffs and the costs; that at the time of suing out said attachment, and ever since that time, the said defendant was and is a foreign corporation; and that, by reason of the several premises stated, plaintiffs were entitled to recover the said sum of twenty-five thousand dollars damages from said defendant, and to have its property located in Monongalia County attached and sold, according to law, to satisfy their said claim; and aver that defendant is seised and possessed of very much valuable property, both personal and real, in said county, which was liable to the levy of said order of attachment; and pray that they may recover of and from said defendant the said sum of twenty-five thousand dollars damages and costs; that the property of said defendant liable to attachment be made liable to the satisfaction of the decree and costs of suit, and all interlocutory decrees and orders be entered as may be necessary to enable plaintiffs to recover, etc., and for general and special relief.

At rules held in the clerk's office of said court on the first Monday in October, 1895, the defendant appeared and filled its plea in abatement to the attachment, averring that at the time of the suing out of the attachment, and for a long time before and since, the defendant was a corporation duly incorporated by the laws of the commonwealth of Pennsylvania, one of the states of the United States, and that prior to the suing out of said attachment the defendant did file with the secretary of state of the State of West

Virginia a copy of its articles of corporation, and of the law and authority, etc., and that, having complied with the law in everything required by the statute of foreign corporations, therefore the grounds stated and contained in the affidavit upon which said attachment was founded did not exist at the time said affidavit was made and at the time said order of attachment was issued, and had in fact no existence, to wit, "that he, the affiant, believes the defendant, the South Penn Oil Company, is a foreign corporation," which plea was verified. Defendant filed its demurrer and answer; does not admit, and called for strict proof of, the allegation of the bill that, owing to the nature and porous character of the oil-producing sand rock in that belt or field, a well drilled to that rock would drain and produce the oil for a considerable distance around or away from the place where the well is drilled in the rock, and that wells drilled around or close to a given tract of land, such as the tract aforesaid, would drain the oil and gas, or a greater part of each, from such tract of land, and leave it practically valueless for oil purposes, unless wells be drilled and operated on such tract in such proximity to the lines thereof as would protect the oil and gas under the same, and prevent the same being drained by the wells on adjoining tracts; avers that it commenced to drill on April 18, 1892, and completed on July 19, 1892, a well which produced twenty-five barrels per day, and immediately on its completion began the drilling of other wells on said tract, and drilled sixteen wells thereon, fourteen of which were producing wells, and the other two were dry; that, from the time of the commencement of said first well, defendant had prosecuted the drilling of oil wells on said tract continually, without interruption, up to the 2d day of September, 1895, when the last well was completed, except that between the 29th of September, 1893, and the 23d of October, 1893, less than a month, when work on the drilling was suspended; that defendant had drilled as many wells on said tract as good business operations required; that its operations were in all respects in conformity with the business of producing oil, and had fairly protected and did protect the rights of plaintiffs, so far as they were the owners of the land; denied all allegations of the bill which

directly or indirectly charged that it was required to bore
any wells on said land which were not bored, or do any-
thing in the way of boring wells or otherwise to protect
said land which was not done; admits boring the Tooth-
man wells, numbers one and two, on the adjoining land of
Daniel Toothman, but avers that, in order to protect plain-
tiff's interest, defendant located and drilled a well near the
line of the Toothman land, between about the same dis-
tance from the line that the Toothman wells were located,
which was completed September 2, 1895, and was dry, and
it was bored at an expense of not less than eight thousand
dollars, which was a total loss to defendant, and was all the
well that should have been or should be bored opposite or
near said Toothman wells or line; admits drilling wells on
adjoining lands, but denies that such wells drain the oil
and gas from plaintiffs' land, thereby greatly reducing the
value thereof; that such wells as were drilled by it on ad-
joining lands were drilled lawfully under contracts of
lease of said lands, and that it had done all things required
of it by the deed and decrees; and denies all allegations
charging defendant with wrongfully and unjustly failing
and refusing to drill such wells on said land as were nec-
essary to protect the oil and gas thereunder; that the oil
and gas under the land remained unprotected, unproduced,
and undeveloped; and avers that the sixteen wells located
and on plaintiff's land were located and drilled upon what
was supposed and deemed to be the most productive and
valuable part of the said tract for oil and gas purposes, and
also with a view to the development of the said tract for oil
and gas purposes, and of obtaining all the oil possible
therefrom, and the promotion of the interests of the plain-
tiffs as well as the interests of the defendant; and filed a
map showing the location of the sixteen wells, Exhibit XX;
and avers there are more wells drilled for oil and gas upon
plaintiffs' land than upon all the tracts adjacent or adjoin-
ing thereto, and that more oil has been produced and is be-
ing produced from the wells upon plaintiffs' land than from
the wells upon several adjacent tracts; denies that it was
necessary to drill at least thirty wells on said tract in or-
der to protect the oil and gas from being drained and taken
off by wells on adjacent lands; denies any loss or damage

to plaintiffs, as alleged, by reason of failure of defendant to drill the wells plaintiffs claim it should have drilled on said land; and denies that defendant was at the time of suing out the attachment, and is and was, a foreign corporation, and liabel to be attached as such; and denies the right of plaintiffs to sue out an attachment against defendant; and denies the existence of grounds on which said attachment is founded; and avers that at the time of suing out the order of attachment, and long before, the defendant was a corporation duly incorporated under the laws of the commonwealth of Pennsylvania, one of the states of the United States; that prior to the suing out of said attachment, it filed with the secretary of state of West Virginia a copy of its articles of incorportion, and of the law and authority under which it was incorporated, and the secretary of state, in pursuance thereof, issued a certificate of that fact, which certificate was, before the suing out of said attachment, filed and recorded in the clerk's office of the county court of Marion County, West Virginia, one of the counties in which its business is conducted; and filed with its answer copies of such articles, certificate, etc., as exhibits; and avers that it had fully complied with section 30, chapter 54, Code, and all other statutes on the subject, and had accepted of the provisions of said chapter, and is therefore entitled to the rights, powers, and privileges, and subject to the same regulations, restrictions, and liabilities, that are conferred and imposed upon corporations chartered in the State of West Virginia, under the laws of West Virginia; and avers that it is, as to all its transactions in the State of West Virginia, including all its contracts, a domestic corporation, and not liable to attachment in the State as a nonresident or foreign corporation; and denies the right of plaintiffs to maintain this suit in a court of equity, and the right of the court to grant the relief prayed for by plaintiffs; and prays that the attachment issued and levied in this cause be abated and quashed, and plaintiffs' bill be dismissed, and that it recover its costs, etc.

On the 26th of October, 1895, the cause was heard upon defendant's motion to quash the attachment, and plaintiff's objection to the defendant's plea in abatement and motion to reject said plea, upon plaintiffs' exceptions indorsed

upon defendant's answer, and upon defendant's demurrer to the bill, and the court took time to consider. The parties also filed a statement of the run of oil from the Ammons and other farms, furnished by defendant, to be used by plaintiffs, if competent testimony for them, and as though they had made the proof in the ordinary way. The statement of runs of oil from the tanks into the pipe lines from the respective wells named in statement begins with and shows seven-eighths of the first run from the respective wells after completion, and all the seven-eighths oil run therefrom prior to 29th of October, 1895; that the wells designated "M. Ammons" are on the two hundred and forty-three acres; that the well designated "Armina Ammons" is the well alleged in the bill to be on the lands of Milton A. Ammons, adjoining the two hundred and forty-three acres; that all the other wells shown in the statement are wells referred to in the bill, on lands adjoining the two hundred and forty-three acres. On the 20th of June, 1896, the cause was heard on the bill, the separate answer of the corporation defendant, general replication thereto by plaintiffs, affidavit, and order of attachment, plea in abatement to said attachment, motion of plaintiffs to reject said plea, defendant's motion to quash the attachment, defendant's demurrer to plaintiffs' bill, and joiner therein by plaintiffs, and depositions taken and filed in the cause, when the court rejected the plea in abatement and dismissed the plea, overruled the motion of defendant to quash the attachment and the demurrer to the bill, and on motion of defendant all other questions were reserved for the future determination of the court. On the 21st of October, 1896, on its motion, the defendant corporation was granted leave to file in the papers within twenty days from that date an amended answer to plaintiffs' bill; and leave was granted plaintiffs to except or reply thereto, or make such defense thereto as they might deem proper. Such amended answer was filed, averring that Exhibit XX, filed with the original answer of defendant, therein stated to be perfect, showing the correct description of the lands in the bill described, and the correct location of the oil and gas wells therein, was not, in several particulars, a correct map, and did not show the correct location of all the wells on the

land, or of those oh the adjoining lands, and proceeded to give such correct locations, and filed Corrected Map XX as an exhibit with the amended answer.    On the 11th of February, 1897, plaintiffs asked to submit the cause upon a motion to refer the cause to a commissioner to ascertain the damages to which plaintiffs were entitled, which motion the defendant resisted, and moved that the cause be continued, to give it the opportunity to take additional testimony, and filed the affidavit of N. F. Clark, vice president of the defendant corporation, in support of its motion; and plaintiffs filed the counter affidavits of Frank Cox and George C. Baker, and the court continued the case.    On the 15th of June, 1897, defendant filed with its answer and amended answer Exhibits W, Z, Y, X,—papers and documents purporting to show that it had complied with the statute requiring it to appoint an attorney in fact to accept service, etc,. and filed in the office of the secretary of state a copy of its charter, and of the laws of the state under which it was incorporated,—copy of the charter, etc., and that it had filed and had recorded it in the clerk's office of Marion County court, and had complied with section 30, chapter 54, Code; and the defendant tendered its plea in abatement to the attachment issued in the cause, to the filing of which plaintiffs objected, and moved the court to reject the plea, and the court sustained the motion and rejected the plea in abatement; and the defendant filed "additional exceptions" to depositions of plaintiffs, and renewed its exceptions taken and noted when the depositions were taken.    On the 10th day of February, 1898, defendant tendered in open court its second amended and supplemental answer to plaintiffs' bill, alleging necessary additional parties, to which answer plaintiffs excepted and objected to the filing thereof.    The court overruled the objection to the filing, and the answer and exceptions thereto were made a part of the record in the cause.    Said answer avers that defendant had just learned, on the —— day of February, 1898, that there were not proper and necessary parties to this suit, and should the pretensions of plaintiffs be sustained by the court, and defendant made liable for damages as claimed by plaintiffs, great injury might and perhaps would result to defendant, unless the

court required that such additional persons be made parties; that one day, the week before making the answer, defendant learned that within the then past few months an additional child had been born to Armina Ammons and Milton A. Ammons, and, on inquiry to learn the sex and name of the child, ascertained that it was born on the —— day of last September, and was named Willie Vetis Ammons, and also that not only, in addition to the eight plaintiffs, said Willie Vetis had been born to said Armina and Milton A. Ammons, but that two other children, named Ollie Cecil, then aged four years, and Carlie Ross, then aged two years, making three children of the said Armina and Milton A. Ammons, all living, who were not parties to the suit, and who were necessary parties thereto; that two of said children were born long before the institution of this suit, and there could be no valid reason why they were not made parties at the time of filing the bill.

On the 21st of February, 1898, the cause was heard upon the bill and exhibits, the answer, amended answer, and second amended and supplemental answer, exhibits, replications to said answers, upon the depositions (except that of E. B. McGara, which was withdrawn), the objections and exceptions of plaintiffs to depositions and questions and answers, in so far as objections or exceptions were taken by plaintiffs, and upon the objections and exceptions of the defendant corporation to the depositions of plaintiffs taken and filed in the cause, and to the questions and answers therein contained, in so far as objections or exceptions have been taken by defendant, and upon the statement of the runs of oil filed under agreement of counsel; and, it appearing that plaintiff Howard L. Ammons was past the age of twenty-one years, the cause was ordered to be prosecuted in his own name, and he appeared by counsel, assenting thereto; and, on motion of plaintiffs, Armina Ammons and Milton A. Ammons, her husband, in his own right, were made parties defendant to the suit, and appeared by counsel, and waived process or other further notice therein, and consented to being made parties defendant therein, to which motion defendant corporation objected, and excepted to their being made parties defendant which objection was overruled, and all objections and exceptions to depositions

and to questions and answers were overruled, and the defendant corporation was enjoined from setting up claim or maintaining any right, title, or claim for oil and gas purposes under and by virtue of the deed from Special Commissioner Charles Powell, mentioned and referred to in plaintiffs' bill, and from drilling, occupying, or operating for oil and gas in and upon the four lots of land, parts of the two hundred and forty-three acres mentioned in plaintiffs' bill, as shown and laid down by metes and bounds on the plat filed as Exhibit XX with the original answer of defendant South Penn Oil Company, by George W. Johnson, surveyor of the county, "under the order of the court now made," which lots are numbered one, two, three, and four, respectively, set forth by metes and bounds in the report of said Johnson, in writing, dated February 14, 1898, filed as an exhibit, marked "GWJ;" the metes and bounds of the said several lots being given in the decree. The injunction to be in effect unless the South Penn Oil Company should within ten days from the entering of the decree file in the cause a declaration stipulating that it would begin to drill within twenty days from the same date a well for the production of oil, and thereafter prosecute and complete the same with all reasonable diligence, and in good faith, to the depth required for the obtaining of the oil in the Big Indian sand upon said lot No. 2, and, if it fail to do so, its rights and privileges for oil and gas upon said lot No. 2 shall be taken and deemed to be abandoned by it. The same provision was made as to lot No. 1, except the stipulation was to be filed within twenty days, and drilling begun within sixty days; and, as to lot three, stipulation to be filed within thirty days, and drilling begin within ninety days; and, as to lot No. 4, stipulation to be filed within forty days, and drilling to begin within one hundred and twenty days,—all from the date of entering the decree; "and, on failure to prosecute the work on each of said lots as set forth touching lot No. 2, the abandonment of the respective lots will be deemed to have taken place by defendant at the times mentioned, respectively." The decree provided that the restraining and enjoining order should not apply to any one or more of said four lots as to which the defendant South Penn Oil Company should

fully comply with the provisions of the decree made in re-
lation thereto, and that nothing contained in the decree
should in any wise effect the rights, privileges, and re-
quirements of said defendant as to the residue of said tract
of land not included in the boundaries of said four lots; and
referred the cause to I. G. Lazzell, a commissioner in chan-
cery, to ascertain and report: "First, what amount of
damages, if any, the plaintiffs have sustained by reason of
the failure of the defendant South Penn Oil Company to
immediately commence and drill such wells for oil and gas
on the said tract of land mentioned in plaintiffs' bill   *   *
*   after oil was found thereon by the defendant South
Penn Oil Company in paying quantities, as seemed neces-
sary and proper to protect the oil and gas in and under the
said tract of land; second, anything deemed pertinent by
said commissioner, or specially required by any of the
parties in interest in this suit;" and leave was granted
either party to retake the depositions of any witness or
witnesses whose depositions had been taken in the cause,
if they so desire, and to take any other proper evidence,
either before said commissioner or in the cause, but if not
taken before the commissioner, the same should be taken
upon proper and legal notice, from which decree the de-
fendant South Penn Oil Company appealed.

Appellant insists that the court erred in rejecting its
plea in abatement to the attachment; that the defendant
corporation, having complied with section 30, chapter 54,
Code, to enable it to do business in this State, and with all
other statutes concerning foreign corporations, so far as
same could apply to defendant, was entitled to immunity
from the harsh proceeding of attachment, and to be placed
upon the same footing as domestic corporations, and its
plea should have been filed, and not rejected.   The provis-
ions of section 30, are simply conditions precedent to the
right of foreign corporations to do business in this State,
and do not convert such corporations into domestic corpo-
rations, as has been frequently held by this Court (*Quesen-
berry* v. *Association*, 44 W. Va. 512, (30 S. E. 73), and cases
therein cited; and, being foreign corporations, they are
liable, under chapter 106, Code, to attachment.

Appellant contends further that its demurrer to the bill

should have been sustained for want of jurisdiction. The principal object of the suit appears to be to enforce a claim for damages for a wrong, for draining the oil and gas from the premises in question, and producing the same through wells drilled on lands adjacent to plaintiffs' land. Our statute provides (section 1, chapter 106, Code) that such attachment "may be sued out in a court of equity for a debt or claim, legal or equitable, whether the same be due or not, upon any of the grounds aforesaid," etc. It is contended by appellant, however, that this statute is in violation of the constitution, which provides, in Article III., section 13, that "in suits at common law where the value in controversy exceeds twenty dollars, exclusive of interest and costs, the right of trial by jury if required by either party shall be preserved." This question has been settled in this State in *McKinsey* v. *Squires*, 32 W. Va. 41, (9 S. E. 55), (Syl., point 1), where it is held, "Our statute (Code 1887, chapter 106, section 1), which provides that an attachment may be issued out in equity for the recovery of damages for a wrong, is constitutional," and in *Cecil* v. *Clark*, 44 W. Va. 659 (30 S. E. 216), (Syl. point 3), "Where already at the time of the adoption of the Constitution, equity exercised jurisdiction in certain matters, the clause of the constitution guarantying jury trial does not relate to such matters, or deprive equity of jurisdiction therein, to act without a jury." Cooley, Const. Lim. 504; Sedg. St. & Const. Law, 486, 488; *Steamboat Co.* v. *Roberts*, 48 Am. Dec. 186, 188. Appellant contends (and that too, with a great deal of force and reason) that, by extending equity jurisdiction to claims of this character, parties are deprived of trial of their rights by jury. The truth is (and I give it only as my individual opinion) that a non-resident or foreign corporation defendant, by the proceeding in equity by attachment against such defendant, may in all cases be deprived of his right of trial by jury, under our decisions, notwithstanding the constitutions of the State and of the United States, simply because of non-residence. The reasoning of the learned judge who prepared the opinion in *McKinsey* v. *Squires* is not very clear or satisfactory. He says: "But assuming that the legislature has not the power to deprive a party of the right of trial by jury by

simply changing the form of action, and giving a court-of equity jurisdiction over a purely legal demand, the question still remains, does this statute deprive a party of a trial by jury? We have a statute which provides for a trial by jury in any chancery case, where there is a conflict of evidence, 'or an inquiry of damages.' Code 1887, chapter 131, sections 4, 5.'' He concludes that, as the appellant could have had trial by jury if he had required it, therefore he did not think the statute unconstitutional. Section 4, referred to, provides that in a pending chancery cause, in which there is such a conflict in the evidence as, in the opinion of such court, to render it proper, it may direct an issue thereon to be tried in such court or in any other circuit court. This could be done on the suggestion or motion of either party, if the court chose to grant it, but it is evidently entirely in the discretion of the court whether the issue is directed or not; and when it is so directed, and the court should see proper to set aside the verdict, it is not permitted, under the statute, to grant a new trial. The only object of such trial is to enlighten the conscience of the court. Is that such provision for trial by jury as is contemplated by the constitution? Can a party demand and have a jury as a matter of right? The same section provides that ''no issue out of chancery shall be directed in any other case,'' and then provides further that nothing in the section contained shall be construed to conflict with chapter 77, Code. The provision for ''an inquiry of damages'' contained in section 5, referred to in said case of *McKinsey* v. *Squires*, can only be had in a case ''other than a chancery case,'' as stated in the section. When we consider the immense mass of evidence taken in the case at bar, and the conflict therein, it would seem that the court would gladly have accepted the aid of the jury, if requested by either party to the suit, and directed an issue, but it does not appear that either party required such trial; and can appellant complain, not having asked for a jury?

Appellant says the court erred, in that, if it had jurisdiction under the allegations contained in the bill, the claim being a purely legal one, and there being no accounts to be stated, if the court was of opinion that under the facts as they appeared, and the law governing them, the plaintiffs

were entitled to recover, it should not have referred the cause to a commissioner in chancery, with power to take additional testimony, but should have determined the cause, and entered a final decree upon the testimony already taken. The prayer of the bill is that the plaintiffs recover of and from the defendant South Penn Oil Company the sum of twenty-five thousand dollars damages; that, upon a hearing of the cause full and complete justice be done between the parties; and that such other relief, both general and special, be granted to the plaintiffs as to the court may seem proper, etc. The recovery of the twenty-five thousand dollars for damages sustained by appellees by reason of the alleged failure of appellant to drill as many wells as seemed necessary to protect the oil and gas under the tract of land in question is the only relief specifically asked for in the prayer of the bill. What is involved, of which the commissioner could take an account? Sections 1, 3, chapter 129, Code, indicate the purpose for which commissioners are appointed. In *Tilden* v. *Maslin*, 5 W. Va. 377, JUDGE BERKSHIRE, in rendering the opinion of the Court, on page 378, says: "It was insisted in the argument here that an account should have been ordered by the circuit court, to enable the appellant Tilden to establish his alleged set-off and account against Seymour. But the uniform doctrine of courts of equity is that it is improper to order an account merely to afford a party an opportunity to establish by testimony the allegations of his bill,"—the last sentence of which is the syllabus of the case; and *Lee County Justices* v. *Fulkerson*, 21 Grat. 182, is cited with approval; and *Livey* v. *Winton*, 30 W. Va. 554, (4 S. E. 451), (Syl., point 7), is to the same effect: "It is improper to order an account merely to establish by testimony the allegations of the bill." See, also, 3 Pom. Eq. Jur. § 1421. There are no matters of account in case at bar to refer to a commissioner,—nothing upon which he could decide.

Appellant contends that the court erred in decreeing that lots Nos. 1, 2, 3 and 4 should be taken and decreed to have been abandoned by the defendant and forfeited by it unless within a certain number of days such wells should be commenced on the lots, respectively, as set

out in the decree, and the work diligently prosecuted, and that the court erred in granting the plaintiffs relief which was not germane to the bill, and which could not be granted under the allegations and the prayer of the bill; i. e. the forfeiture of the rights of appellant to said certain portions of said land designated as lots 1, 2, 3, and 4. The appellees rely upon the case of *Kleppner* v. *Lemon*, 176 Pa. St, 502, 35 Atl. 109, to support their decree, requiring appellant to drill wells on the said four lots, or forfeit its rights therein. That was a case, under an ordinary gas and oil lease, where, until oil was found in paying quantities, the only right the lessee had was the exclusive right to explore and drill for oil and gas for a given time. When the oil was found in the quantities named, the lessee had a vested estate in the oil, and implied covenants on his part to drill such further wells as seemed necessary to develop and protect the property. In a case recently decided by the Supreme court of Pennsylvania (not yet reported) Justice Mitchell, in the opinion, says: "This is a bill in equity against lessee for specific performance of covenants, or, in the alternative, for forfeiture of the lease and also for an account. As the covenants are merely implied, and their extent depends altogether on oral evidence of opinions, the case for relief is wholly wanting in that precision and certainty of contractual duty which is necessary to sustain the ordinary chancery decree for specific performance. The jurisdiction of equity in a similar case, was, however, sustained in *Kleppner* v. *Lemon*, 176 Pa. St. 502, 35 Atl. 109, and we do not now propose to question it. But that decision was on the ground of fraud, the majority of the court being of opinion that the defendant was fraudulently evading his obligations to plaintiff while draining the oil from plaintiff's land through wells on adjacent territory. 'The findings show,' says Williams, J., 'that it is the expressed purpose of the defendant to secure Kleppner's oil through his wells on the Garlach and Stotler tracts of land.' The basis necessary to sustain the bill, therefore, is fraud, and that, of course, must be affirmatively and clearly proved." In the case at bar appellant was the absolute owner of seven-eighths of plaintiffs' interest in the oil, having purchased and paid for

the same, and which was conveyed to it; and a part of the consideration of the purchase was that it should "begin to operate, mine, and bore for oil and gas within and under the said tract, free of cost to the said infants or their guardian, within sixty days after the confirmation of the sale; * * * and, if oil be found thereon in paying quantities, then, after said first well is completed thereon, the said purchaser shall immediately commence and drill other wells thereon, as shall seem necessary to protect the oil and gas in and under the said tract of land." Appellees insist that it has violated the conditions and terms of the deed under which it holds, in that it has not drilled a sufficient number of wells to protect the oil and gas in and under the land in question against drainage from wells drilled by appellant on adjoining lands; that it has discriminated unfairly against plaintiffs in developing the adjoining lands; that it has drilled but sixteen wells upon said tract, when it should have drilled at least thirty. If this be true, is the appellees' remedy by forfeiture of appellant's rights in the oil and gas in such parts of the land as are not properly protected? The remedy is by an action for damages caused by such breach of conditions of the deed or failure of duty. *Harris* v. *Coal Co.*, 57 Ohio St. 118, 48 N. E.502. In that case it is held that "a breach of the implied covenant to reasonably develop and protect lines does not have the effect to forfeit the lease, in whole or in part; nor is it good cause for a court to declare such forfeiture, unless the lease, in express terms, provides that a breach of such implied covenant shall avoid or forfeit the lease." Koch & Balliet's Appeal, 93 Pa. St. 434; *McKnight* v. *Kreutz*, 51 Pa. St. 232; *Janes* v. *Oil Co.*, 1 Penny. 242; *Blair* v. *Peck, Id.* 247; *Paschall* v. *Passmore*, 15 Pa. St. 295. In the case at bar there is no forfeiture clause for failure to develop or protect the premises. It is a question of good faith on the part of appellant. It is provided that, when oil is found in paying quantities, appellant shall immediately commence and drill other wells thereon as shall seem necessary and proper to protect the oil and gas in and under said land, which primarily means "which seem necessary" in the good, honest, business judgment of the appellant. *Kleppner* v. *Lemon*, before cited. If this is done in good faith,

it cannot be held liable; and, as is held in *Colgan* v. *Oil Co.* (Pa. Sup.) 45 Atl. 119: "It is only when the wells on adjoining territory are being fraudulently used to drain the complainant's land that courts have any occasion to interfere. The practical test is to be found in the question, are the outside wells draining plaintiffs' wells to such an extent that, if the former were operated by a third party, the defendant, as lessee of the latter, would find it good management to put down another well to save its own leased territory from exhaustion? If so, then good faith to its lessor would require it to put down the additional well, that the lessor might get his proper royalty. But, if not, the latter has no cause of complaint. If plaintiff, as owner, would not find it profitable to put down another well to stop his neighbor's drainage of his land, the lessee cannot be held to any higher obligation. He is not bound to work at his own loss for his lessor's profit." The same opinion further says: "So long as the lessee is acting in good faith on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudulently with intent to obtain a dishonest advantage over the other party to the contract. Nor is the lessee bound, in case of difference of judgment, to surrender his lease, even *pro tanto*, and allow the lessor to experiment. Lessees who have bound themselves to covenants to develop a tract, and have entered and produced oil have a vested estate in the land which cannot be taken away on any difference of judgment. It is not within the jurisdiction of any court to oust the owner and forfeit the title to estates in that way, and the jurisdiction of equtiy to decree any specific act or declare forfeiture depends on fraud averred and fully proven."

The defendant entered exceptions to the depositions of plaintiffs as they were being taken, to questions and an-

swers as they were entered, and also filed special excep-
tions, all of which exceptions, as well as those taken to the
depositions of defendant by plaintiffs while they were be-
ing taken, were overruled by the court, and the depositions
were allowed to be read in the cause, in which action of the
court in overruling defendant's exceptions appellant insists
that the court erred; claiming that testimony to the effect
that there is a presumption that oil drains into an oil well
equally from all directions in certain character of oil-bear-
ing rock is incompetent and should not be considered; this
evidence is speculative, and mere guesswork, especially in
territory as "spotted" as that in controversy is shown to
be. *Duffield* v. *Rosenzweig*, 144 Pa. St. 520, 23 Atl. 4, was
a case in which the lessee of a lease for oil purposes had
the exclusive right of boring for oil on a certain tract of
land, but was restricted to certain specified sites.   While
the lessee had no such possession as would support eject-
ment as to land outside the designated sites, yet he had
the protection of the entire leasehold, and equity had jur-
isdiction to restrain the lessor, or others acting under him,
from drilling wells thereon outside the designated sites,
and thereby lessening the production of lessee's wells; and
it is held, "In such case the damages are not to be
measured by the amount of oil taken out of defendants
wells so drilled (outside the designated sites), nor by the
speculative opinions of operators as to how much of it
might have been obtained through the plaintiff's wells, but
they may be measured by the difference in the value of the
plaintiff's leasehold before and after the injury was com-
mited."   Justice Clark, in preparing the opinion of the
court in the case, says,   "A large part of the testimony in-
troduced upon this subject, it must be concluded, was of
the most unsatisfactory character.   It was to a great de-
gree fanciful, conjectural, and speculative.   The witnesses
were asked to state from their experience as oil operators,
and their knowledge of the Clarendon sand, from the loca-
tion of the plaintiff's wells around the mill yard, and the
location of the wells of the defendant, what proportion of
the oil produced by those three wells during the term of
the lease from Burns to Pratt would be taken or could have
been taken out through the plaintiff's wells.   The esti-

mates ranged from one-third to seven-eighths of the production of the three wells. The testimony shows that the subject is one as to which there is great diversity of opinion. Operators have widely different ideas. * * * It is plain, from a careful reading of the evidence, that the estimates made were mere guesses. * * * It is impossible, we think, to make any estimate of the plaintiff's damages upon this basis which would be even approximately correct. Assuming that this would ordinarily be the proper measure of damages, we are obliged to resort to some other; for, in the very nature of the case, proof upon this basis of assessment is wholly impracticable,—indeed, impossible." This case, after retrial, was again taken to the supreme court (150 Pa. St. 543, 24 Atl. 705), where it was held that "the damages cannot be estimated by the amount of oil which the new wells might drain from the old wells, the proof of damages upon this basis being impracticable, in the nature of the case;" and all questions on the "drainage or suction theory" asked of witnesses, looking to that basis for fixing damages sustained by the plaintiff, were rejected as incompetent evidence.

The objection to the deposition of plaintiff's witness J. G. Samsell, so far as it refers to the drainage of oil to wells outside from the Ammons farm, and to the filing of the map made by the witness purporting to indicate the drainage area on the southwestern boundary of the Ammons farm, should have been sustained. The objection to the evidence of witnesses given as expert testimony, where they have not shown themselves to be experts, should be sustained, but this cannot apply to witness J. G. Samsell, who was a civil engineer of twelve years' experience, and with sufficient experience in the oil fields, in locating the position of wells, and determining the elevation of the sand at the point where said wells were drilled, for the purpose of determining locations for new wells or wells to be drilled; and he shows that he had familiarized himself with the oil-producing rock, etc. A man does not necessarily have to be a thorough geologist to be an expert in matters pertaining to the production of oil, however desirable a knowledge of geology may be. Practical observation alone will make an expert of the man of good common sense in any given line of business.

There are questions to be determined in the cause which should be settled by the court itself, or by directing an issue out of chancery, to be tried by a jury, to ascertain whether any of the conditions or covenants of the deed from Special Commissioner Powell to appellant have been violated, to the prejudice of appellees, and, if so, the damages sustained by them. In *Oil Co.* v. *Blair*, 113 Pa. St. 83, 4 Atl. 218, in an action of covenant,—a case in which the cause of action was the same as the case at bar,—brought by the lessor against the lessee for breach of covenant in refusing to bore any other wells, the instruction given by the trial court to the jury as to the measure of damages for the breach of said covenant, and held not to be error, was as follows: "Ascertain how much more oil the plaintiff ought to have received than he actually did receive, and the value of it during the times when it should have been delivered to him. From this deduct the cost of producing what ought to have been produced at the time, under the circumstances, and with the appliances then known, and add to this remainder the interest on it from the time when the oil ought to have been produced to the present time, and this will be the measure of damages sustained by the plaintiff." This rule, however, cannot apply in case at bar, so far as deducting the cost of production is concerned, because the oil, as provided in the contract, is to be delivered to plaintiffs free of cost.

It is assigned as error by appellant that the court made Milton A. Ammons and Armina Ammons parties defendant to the suit after the cause had been submitted, and without filing an amended bill. Appellant objected to the action of the court in so making them parties. They were entitled to one half the royalty in the oil produced, while plaintiffs were entitled to the other half. They should have been made parties plaintiff, instead of defendants, and could not properly be made defendants in any case without an amended bill filed for the purpose, showing what interest, if any, they had in the subject-matter in controversy. For the reasons herein stated, the decree of the circuit court is reversed, and the cause remanded for further proceedings to be had therein.

*Reversed.*