[S. F. No. 5815. Department One.—November 29, 1911.]

W. F. CHANDLER and H. H. WELSH, Respondents, v. WM. H. H. HART, WILLIAM E. FEARON, and CALIFORNIA-COALINGA OIL COMPANY (a Corporation), Appellants.

LEASE OF OIL LAND—WANT OF COVENANTS BY LESSEE—SIGNATURE NOT REQUIRED—DELIVERY AND ACCEPTANCE.—Where a lease of oil land to an oil company gave it the privilege to develop the land for oil for a term of years, subject to certain conditions, but contained no

covenants on the part of the lessee, its signature thereto was not necessary as evidence of its consent thereto; but its execution by the lessor became effectual and complete upon its delivery to and acceptance by the lessee, with intent to take under it. This was sufficient to bind the oil company, as lessee, to the performance of the conditions expressed therein.

ID.—WAIVER OF COVENANTS TO BE PERFORMED.—Even if the lessor might have insisted upon a signature to the lease by the oil company, as lessee, as containing covenants to be performed on its part, his conduct in delivering the lease thereto without such formality was a waiver thereof; and upon its delivery to and acceptance by the lessee, it became at once operative and binding against the lessor and his heirs or assigns.

ID.—TERMS AND PURPOSES OF LEASE TO OIL COMPANY.—Where the lease of the land to the oil company purported to lease and demise the land thereto for a term of fifty years from its date, and gave it the right to explore and develop the same for the purpose of removing therefrom oil, gas, and other minerals, and erecting therein such works, machinery, tanks, and pipes as are necessary to carry out the purposes stated in its articles of incorporation, which empowered it to acquire, develop, improve, buy, sell, and dispose of real and personal property and mineral products, which included the business of extracting oil from the premises leased, and selling the same, such lease was intended to convey such rights with the land leased and vested a present interest therein for the term and purposes specified, unless forfeited by a breach of the conditions of the lease.

ID.—NATURE AND EFFECT OF DEMISE AND LEASE FOR YEARS—WARRANTY. —A demise and lease for a term of years is more than a license to enter and occupy for a specified purpose, but it has the effect of a conveyance for the term of years specified, and the use of the word "demise" creates an implied warranty of title and a covenant for quiet enjoyment of the interest in the land for the period and purposes specified.

ID.—PURPOSES OF LEASE LIMITED.—The lease may and does limit the uses which the tenant may make of the land and the purposes for which it shall have the right of possession by particularly describing them, and so implying that the land leased shall not be used by the lessee for other purposes. The result is that the lessee was granted an estate in the land for fifty years for the purposes of discovering oil therein and of extracting and selling it, with the other incidental rights mentioned.

ID.—CONDITIONS OF LEASE—NON-ASSESSMENT OF SHARES AS CONSIDERATION—RIGHTS OF LESSOR—TIME OF OPERATIONS FOR OIL NOT SPECIFIED.—Where the only conditions contained in the lease were that shares of stock in the lessee oil company, given as consideration therefor, should not be assessed and that the lessor should have the right to reside on and farm the land; and there is no claim that either of these conditions were broken, and there is no condition that

the lessor shall begin operations within any specified time during the term, his neglect in that regard cannot forfeit the lease.

ID.—FORFEITURES NOT FAVORED—DEMISE UPON FULL CONSIDERATION—DELAY IN OPERATIONS FOR OIL.—Forfeitures are not favored in law or in equity. No rule declares that a demise of land for oil purposes for a term of years, upon a full consideration received by the lessor in advance, is forfeited by neglect or delay of the lessee to develop or extract the oil, if no such right of forfeiture is reserved in the demise, either expressly or by necessary implication from its expressed terms.

ID.—RULES AS TO CONDITIONAL LEASES INAPPLICABLE.—The rules of law relating to conditional oil leases relative to the extraction of oil within a time specified, and to the diligent prosecution of the work, and to leases given for an interest in the result, have no application when no conditions have been violated and the value of the use is fully paid in advance, and consequently the estate and right of possession continue to exist, notwithstanding the failure to do the work contemplated or to make a discovery of oil in the land conveyed for a term of years.

ID.—ASSIGNABILITY OF INTEREST OF LESSEE IN LAND — SUBLEASE OF PART.—The interest of the lessee in the oil land leased is not a mere possibility not coupled with an interest, which by section 1045 of the Civil Code is not assignable, but is a present, subsisting estate for years which may be transferred, under section 1044 of the Civil Code, the same as any other species of property, where there is no condition or covenant in the lease forbidding its assignment or a sublease of a part thereof. In the absence of such conditions or covenant the lessee had the right to sublease a part of the demised land in consideration of a royalty reserved.

ID.—ESTATE NOT EXTINGUISHED BY SUBLEASE OF PART—RULE OF LAW INAPPLICABLE.—The rule of law, that where the owner of land and a lessee have a common right to mine the lessee cannot assign or sublease a part to third persons, has no application where the owner has no right to mine, but merely reserves a residence and farm right, and the lessee has the full right to develop oil upon the land so far as not interfering with the residence of the owner. In such case a sublease to third parties of a part of the tract does not extinguish the estate of the lessee.

ID.—EFFECT OF LEASE OF LAND FOR OIL PURPOSES—EXTRACTION BY WELLS—INTEREST OF LESSOR IN ROYALTY PROMOTED BY SUBLEASES.—Upon a lease of land for oil purposes, the lessor understands that as many wells will be sunk and operated thereon as may be required to raise all the oil in it. His possession will no more be interfered with, whether the necessary wells are sunk by different persons or by the same person; and if he has an interest in the royalty, that interest will be promoted by increasing the number of wells by subleases to different operators for such royalty.

ID.—RIGHT OF POSSESSION UPON BREACH OF CONDITION — PROHIBITION AGAINST SUBLETTING NOT IMPLIED.—The right of possession reserved to the lessor upon a breach of condition of the lease does not imply, in the absence of such breach, any prohibition against the right of the lessee to sublet to others a part of the land leased, any more than it would prohibit an assignment or sublease of the whole tract.

ID.—SUBLEASE BY OIL COMPANY AS CORPORATION—VALIDITY—CORPORATE SEAL AFFIXED.—Where it is claimed that the sublease to the plaintiffs by the oil company lessee was not lawfully authorized by the corporation, but it runs in the name of the oil company, is signed by its secretary, with the corporate seal attached, and its execution was duly acknowledged and presumably authorized by its directors, the corporate seal attached is *prima facie* evidence of the authority of the secretary to execute the contract for the corporation.

ID.—INCREASE IN NUMBER OF DIRECTORS—FORMALITIES OF LAW COMPLIED WITH—VALIDITY OF FINAL ELECTION—DE FACTO DIRECTORS.— Where upon an increase in the number of directors all of the formalities of law therefor appear to have been complied with, and the increased number of directors was thereafter elected and continued to act as such up to the date of the sublease from the corporation to the plaintiff, even if the meeting of the stockholders at which the increase was authorized is subject to attack upon its validity, it is nevertheless sufficient to justify the sublease that the increased board were *de facto* officers, whose acts are as valid as to third persons as if they were officers *de jure*.

ID.—ESTOPPEL OF STOCKHOLDERS BY CONDUCT—EFFECT UPON CORPORATION.—The stockholders of a corporation are private persons subject to estoppel by conduct; and if a majority of them makes and regularly adopts, certifies, and files an amendment to its articles of incorporation increasing the number of its directors, and then suffers the persons so constituted directors to transact the business of the corporation without objection, the plainest principles of equity and justice would prevent them, or the corporation acting on their behalf, from asserting the lack of authority of such board of directors or a lawful quorum thereof to do business and make contracts for the corporation; and the corporation is bound by such conduct to the extent that a third person may safely deal with it on the strength of the amendment to its articles, regular upon its face.

ID.—INTERFERENCE BY DEFENDANTS WITH RIGHTS OF SUBLESSEE—ACTION FOR POSSESSION AND TO ENJOIN INTERFERENCE.—It is held that the sublessees of the oil company had the right of possession and enjoyment of the land subleased to them, and where the defendants wrongfully entered thereupon and ousted such sublessees, they were entitled to recover possession and to enjoin the defendants from interfering with their rights; and their right of possession is sufficient to support the judgment rendered in their favor, regardless of their title to the oil before it was raised to the surface.

APPEAL from a judgment of the Superior Court of Fresno County and from an order denying a new trial. Walter Bordwell, Judge presiding.

The facts are stated in the opinion of the court.

Wm. H. H. Hart, Aylett R. Cotton, and M. F. McCormick, for Appellants.

Sutherland & Barbour, M. B. Harris, and E. M. Harris, for Respondents.

SHAW, J.—The defendants appeal from the judgment and from an order denying a new trial.

The complaint alleges that the plaintiffs at all times mentioned, were the owners of a tract of land containing one hundred and twenty acres, that they were in possession thereof in March, 1909, and that the defendants on that day ousted them, took possession of the land and have ever since held the same. They pray for the recovery of possession and damages, and for an injunction to prevent defendants from boring wells or extracting oil from the land. Judgment was given declaring that plaintiffs were entitled to the possession of the land, with the right to occupy it for the purpose of mining and developing it and carrying out a certain lease executed on March 6, 1909, by Fearon Oil Company to the plaintiffs. This lease purported to let, lease, and demise to the plaintiffs, for the period of twenty years, the exclusive right, privilege, and easement of sinking wells in the land and taking, appropriating, and selling oil and gas therefrom, yielding to the lessor a royalty thereon.

At the time this lease was executed the only right or title which the Fearon Oil Company had to the land was under a certain instrument executed by Joseph Fearon and wife to said Fearon Oil Company, on September 6, 1907, leasing a tract of one hundred and sixty acres, including the one hundred and twenty acres afterwards leased as aforesaid by that company to the plaintiffs. Joseph Fearon at that time owned the land in fee. Defendants claim under a lease made by Fearon and wife to the defendant, the California-Coalinga Oil Company, on March 6, 1909. The respective rights of the

parties to this action in the land depend upon the validity and effect of the lease by Joseph Fearon to said Fearon Oil Company. Omitting the formal description of the parties and property, we give this lease in full. Fearon and his wife were named as parties of the first part and said Fearon Oil Company as the party of the second part:

"That the said parties of the first part for and in consideration of the issuance and delivery to them of five hundred and twenty-five thousand (525,000) shares of the capital stock of the Fearon Oil Company, full paid up, receipt whereof is hereby acknowledged, does by these presents lease and demise unto the said party of the second part and to its successors and assigns (subject to the provisions and limitations hereinafter mentioned) (describing the 160 acre tract) for a term of fifty years from the 24th day of August, A. D. 1907.

"It is mutually agreed and understood that the said Fearon Oil Company shall have the right to explore and develop said lands for the purpose of removing therefrom oil, gas and such other minerals as the same may contain; to erect thereon the necessary works and machinery, tanks, pipes, and all other appliances required for carrying out the purposes mentioned in the articles of incorporation of the Fearon Oil Company; and to establish and maintain any business or enterprise allowed within the scope of the business of said corporation.

"This lease is made upon the express provision and agreement that the shares of stock delivered to the said parties of the first part in payment therefor shall never be assessed while the same or any of said shares of stock shall remain the property of the said parties of the first part, and in the event said party of the second part shall levy an assessment upon the same or the attempt to collect from the said first parties, or either of them, any assessment upon said shares of stock, then, and in that event, this lease shall immediately terminate, and the said parties of the first part shall have, and they are hereby given, the right to eject therefrom all agents, officers or employees of the said party of the second part.

"It is further understood and agreed that there is now standing upon the land described a residence owned and occupied by the said parties of the first part, and the said parties of the first part are hereby given the right to continue and maintain said residence where the same is now located, together

with all necessary buildings in connection therewith and to have free and uninterrupted access over and upon said lands not actually used or needed for the business of said second party, for the purpose of farming the same; and the right to farm said lands is hereby expressly reserved to said parties of the first part.

"This agreement shall bind the successors, assigns, heirs, executors and administrators of the said parties of the first part."

The said articles of incorporation of the Fearon Oil Company show that the capital stock of that corporation was one million dollars, divided into one million shares, of the par value of one dollar each. The articles state the purposes of the corporation to be "to explore, acquire; exchange, develop, and deal in oil and gas lands; to acquire, build, maintain, operate and dispose of pipe lines for conveying and conducting oil, gas, water and fluids of every description and to acquire, hold, enjoy and dispose of rights of way for the purposes thereof and for other purposes; to purchase, sell, lease, deal in, exchange, convey and accept conveyances of real property, and to mortgage and hypothecate the same; to improve, develop and cultivate lands whether mineral or agricultural, or adapted for any other use whatsoever; to refine, manufacture, buy, sell and deal in minerals and mineral products and personal property of every description and generally to acquire, hold, manage, improve, and dispose of such real and personal property and to do such other things necessary and proper for the full and complete execution of the purposes set forth above, and for the exercise of the powers and transactions of the business of the corporation for the creation of which we have hereby associated ourselves."

1. The lease above set forth was duly executed by Fearon and his wife, but it was not signed by the Fearon Oil Company, or by any one in its behalf. Defendants contend that it could not have any effect unless it was duly executed by the corporation as the party of the second part. There is no merit in this objection. The lease contains no covenants on the part of the lessee to which its signature was necessary as evidence of its consent thereto. The conditions contained therein became binding upon the lessee by virtue of its execution by the lessors and its acceptance by the lessee. Its execution became

effectual and complete upon delivery to and acceptance by the Fearon Oil Company. (Thornton on Oil Leases, sec. 85; *Castro* v. *Gaffey,* 96 Cal. 424, [31 Pac. 363]; *Crescent etc. Co.* v. *Simpson,* 77 Cal. 290, [19 Pac. 426]; 1 Underhill on L. and T., sec. 232.) The evidence shows, without conflict, that the instrument was delivered to the Fearon Oil Company and that it was accepted by that company with intent to take under it. This was sufficient to bind the company to the performance of the conditions expressed therein. Even if it is true that Fearon might have insisted upon a formal execution by the company, as suggested in *Castro* v. *Gaffey,* 96 Cal. 424, [31 Pac. 363], where there were covenants to be performed by the lessee, his conduct in delivering it without such formality was a waiver thereof, and it became at once operative against him, his heirs and assigns.

2. It is next claimed by defendants that the lease was inoperative because the Fearon Oil Company did not explore or develop the land or any part of it, or discover oil thereon or take oil therefrom, prior to the lease to the plaintiffs of the one hundred and twenty acres, on March 6, 1909, or at all, nor do anything on the land to carry out the purposes expressed in the instrument. It is argued that, under the terms of the instrument, no estate or interest in the land would vest in the lessee unless it did something upon the land in performance of the purposes for which it took the lease, and that having no interest itself it could not transfer any to the plaintiffs.

The instrument purports "to lease and demise" the land to the Fearon Oil Company for the term of fifty years from its date, September 6, 1907. It further declares that that company shall have "the right to explore and develop said lands for the purpose of removing therefrom oil, gas" and other minerals, and to erect thereon the works, machinery, tanks, and pipes necessary to carry out the purposes stated in its articles of incorporation. These articles give the company power to acquire, develop, improve, buy, sell, deal in, and dispose of real and personal property, and mineral products. These powers and purposes are very broad and comprehensive. They clearly include the business of extracting oil from the land described in the lease and selling such oil when acquired in that manner. When the entire lease is considered in connection with the articles and the circumstances disclosed by the

writings there can be no doubt that the lease was intended to convey these rights in the land.

It is for these purposes that the instrument demises and leases the land to the company for fifty years. A demise or lease is more than a license to enter and occupy for a specified purpose. A demise is defined as "a conveyance either in fee, for life, or for years," and as "a lease or a conveyance for a term of years." (1 Bouvard's Law Dic.) The use of the word demise creates an implied warranty of title and a covenant for quiet enjoyment. (Id.; Anderson's Law Dic.; 1 Taylor on Landlord & Tenant., sec. 252.) A lease is a "conveyance by way of demise" (1 Bouvard's Law Dic.), or "a conveyance by the owner of an estate to another of a portion of his interest therein for a term less than his own." (Anderson's Law Dic.) It passes a present interest in the land for the period specified. (1 Taylor on Landlord & Tenant, sec. 14a.) This instrument, therefore, granted to and vested in the Fearon Oil Company a present interest and estate in the land for the term of fifty years, for the purposes specified. The right to develop, extract, and market oil therefrom must likewise endure for that period, unless forfeited by a breach of the conditions of the lease.

A lease may, of course, limit the uses which the tenant may make of the land, and the purposes for which he shall have the right of possession. This lease does limit the rights of the tenant, by particularly describing them. The implication is that it shall not be used by it for other purposes. The result is that the lessee was granted an estate in the land for fifty years for the purposes of discovering oil therein and of extracting and selling it, with the other incidental rights mentioned. The only conditions of the lease are those referring to the effect of an assessment upon the shares of stock given to Fearon as a consideration for the lease, and reserving to Fearon the right to reside on the land and farm it. There is no claim that either of these conditions have been broken. The lease does not require the lessee to begin operations under the lease within any specified time within the term. Forfeitures are not favored in law or equity. We know of no rule declaring that a demise of land for such purposes upon a full consideration received in advance, is forfeited by a failure of the lessee to develop and extract the oil, unless such right

of forfeiture is reserved in the demise, either expressly or by necessary implication from the expressed terms.

There are so-called "oil leases" of which this may be true. In them the so-called lessee is granted the right to enter upon the land within a limited time for the purpose of making a discovery of oil. If, upon due search, none is found, the right of entry and possession ceases. If oil is found, the lessee is then given a further right, which then usually becomes a vested right in the oil in place, it being while so situated a part of the land, and this right carries with it the vested right to occupy the land for the purpose of extracting it, usually for a named period, or until the oil is exhausted, and conditioned upon the diligent prosecution of the work. A contract of this character was considered in *Brookshire Oil Co.* v. *Casmalia etc. Co.*, 156 Cal. 211, [103 Pac. 927]. Defendants' counsel cite this and other similar cases, wherein it is held that, under such contracts, no title to the oil or interest in the lands passes until the oil is found, or, in some cases, that no title to the oil passes until it is extracted, and that the estate and right of possession of the lessee in the premises ceases if he does not diligently prosecute to success the work of discovery and the work of extraction after discovery. These decisions are not in point here. In each of them the rights of the parties were controlled by the particular conditions expressed in the contract limiting or forfeiting the right to the licensee or the estate of the lessee. No such conditions are found in the Fearon lease. Cases are also cited of leases for farming purposes upon an annual rent consisting of a part of the annual crops raised by the tenant, in which it is decided that the tenant forfeits his term if he fails to plant the crop which was to provide the rent. It is said that in such cases there is an implied covenant to plant such crop in due time. Manifestly these cases do not apply where the rent is paid in advance, as in the case at bar. No conditions have been violated, the rent is fully paid, and consequently the estate and right of possession continues to exist, notwithstanding the failure of the company to do any of the work contemplated by the parties to the lease, or to make a discovery of oil in the land.

The estate of the lessee is not a mere possibility not coupled with an interest, which, by section 1045 of the Civil Code, is not transferable, but is a present, subsisting estate for years

which may be transferred, the same as any other species of property. (Civ. Code, sec. 1044.) There is no condition or covenant in the lease forbidding the lessee to assign the lease, or to sublet the premises or part thereof. Hence the conclusion necessarily follows that the lessee had the right to make the sublease to the plaintiffs for only one hundred and twenty· acres of the land, unless there is something in the nature of the estate demised by the original lease which forbids such subletting of a part.

3. It is earnestly contended by the defendants that the estate and right given by the lease to the Fearon Oil Company is indivisible, that a part of the premises could not be lawfully sublet without Fearon's consent, and that by attempting to sublet the one hundred and twenty acres to the plaintiffs the entire estate of the lessees was terminated and extinguished. In support of this proposition they cite the following cases: Mountjoy's case, 1 Godbolt 17; *Caldwell* v. *Fulton,* 31 Pa. St. 475, [72 Am. Dec. 760]; *Grubb* v. *Bayard,* 2 Wall. Jr. (C. C.) 81, [Fed. Cas. No. 5849]; *Funk* v. *Haldeman,* 53 Pa. St. 229; *Harlow* v. *Lake Superior I. Co.,* 36 Mich. 104; *Smith* v. *Cooley,* 65 Cal. 46, [2 Pac. 880]; *Hughes* v. *Devlin,* 23 Cal. 502; *Hall* v. *Vernon,* 47 W. Va. 297, [81 Am. St. Rep. 791, 34 S. E. 764].

The foundation of all these decisions is the Mountjoy case. It was decided in 1583, during the reign of Queen Elizabeth. It is reported in Godbolt, as above, and also in Anderson, 307; Moore, 174; 4 Leonard, 147, and in Coke on Littleton, 1646. The case as reported in Godbolt states the reasons for·the rule briefly, but clearly. We give the report on this point in full, retaining the archaic orthography:—

"The Lord Mountjoy by deed, indented and inrolled, did bargaine and sell the manor of Camford to Brown in fee; and in the indenture this clause is contained, provided alwayes, and the said Brown covenants, and grants to, and with the Lord Mountjoy, his heirs and assigns, that the Lord Mountjoy, his heirs and assigns, may digg for ore within the land in Camford, which was a great waste; and also to digg turffe there to make allome and coperess, without any contradiction of said Brown, his heirs and assigns. They agreed, that the Lord Mountjoy could not devide the said interest, viz: to grant to one to digg within a parcel of said waste. And they also agreed, that notwithstanding that Grant, that Brown, his heirs

and assigns, owners of the soile, might digg there, also, like to the case of common *sans nomber*. The case went further, that the Lord Mountjoy had devised this interest to one Laicott for one and twenty years, and that Laicott had assigned the same over to two other men; and whether this assignment was good or not was the question; forasmuch that if the assignment might be good to them, it might be to twenty; and that might be a surcharge to the tenant of the soile. And as to that the justices did agree, that the assignment was good; but that the two assignees could not work severally, but together with one stock, or such workmen as belonged to them both."

The reservation in the deed was as follows:—

"That it shall be lawful for the said Lord Mountjoy, his heirs and assigns, at all times hereafter to have, take and dig, in and upon the heath ground of the said premises, from time to time, sufficient ores, heath, turves, and other necessaries for the making of alum and copperas."

See Anderson, 307, *supra*, and *Caldwell* v. *Fulton*, 31 Pa. St. p. 485, [72 Am. Dec. 760].

It will be seen that the main reason here given for the proposition that a right to mine in the land of another cannot be divided and transferred as to a parcel only, and cannot be enjoyed by co-owners separately, but only "together with one stock," is that if this could be done a similar right might be given to twenty persons, which "might be a surcharge to the tenant of the soil," that is, to the lessor, or owner of the fee. The idea is twofold: 1. That the owner of the soil has a common right to dig for the same ore, and the giving of the same right, separately, to more than the number originally provided, would permit mine openings in many different places, thereby unduly interfering with the owner in the enjoyment of his own mining right, contrary to the intent of the reservation, which implies a single right and a single use of it; and 2. That the owner has the right to make other uses of the land, and this multiplying of the persons and places where the mining right was to be exercised by others under a reservation which was construed to give only a right to mine "with one stock," would impair the other uses of the owner to a greater extent than the reservation intended.

It is clear that the lease to the Fearon Oil Company, in effect, gives to the company the exclusive right to develop and

take the oil and that Fearon thereafter had no right to do so in common with the company. This is not expressly declared, but the respective provisions necessarily imply it. It leases and demises "all" the land described. This, as above stated, covenants for the quiet enjoyment of all by the lessee. It provides that the lessee shall have the right to explore, develop, and take oil from all of it, except that required for the Fearon residence. The only restriction as to area, and the only reservation as to possession or enjoyment by Fearon is the paragraph giving Fearon and his wife the right to occupy the house then standing on the land, and the buildings in connection therewith, as a place of residence, and the right to "free and uninterrupted access over and upon said lands, *not actually used or needed for the business of said second party,* for the purpose of farming the same" and reserving the right to farm said lands. Nothing is here said about Fearon and wife taking oil or using the land for any purpose except for farming and in part as a residence, and the language quoted does, in effect, give the company the paramount right to the exclusive use and possession, so far as necessary for its business of raising the oil. (See on this point *Caldwell* v. *Fulton,* 31 Pa. St. 479, 483, [72 Am. Dec. 760] ; *Funk* v. *Haldeman,* 53 Pa. St. 247.) Therefore, so far as the rule of the Mountjoy case is based on the fact that the lessor and lessee have a common right to develop and take the oil, the reason is wanting and the rule, being in derogation of the right conveyed, should not prevail.

Whatever force there may have been in the second branch of the reason under the conditions of law and fact prevailing in England in the sixteenth century, or as applied to the mining of coal and mineral ores, it does not seem to justify the application of the rule of the Mountjoy case to a lease of a large body of land for the purpose of extracting the oil from it, and especially to the particular lease here involved. The basis of it is the inconvenience to the owner of the land in his use thereof that would arise if a large number of persons were occupying the land in the exercise of the granted right at the same time. Because of this inconvenience, it will not be presumed that he intended such right to be exercised by more than one unless he so declares in the lease or grant, either directly or indirectly. Thus, it is said, a grant of common of

pasture, without stint as to amount, was nevertheless limited at common law to the use by a reasonable number only of the grantee's cattle, and it could not be aliened to several so as to be enjoyable by each, separately, because in each case the right would be enlarged by the additional use and the grantor's estate would be burdened more than was contemplated. In the case of ores and coal, the usual method of taking them, and perhaps the only practicable one, is to sink a shaft or run a drift to the ore bed or vein, and obtain the mineral by means of underground workings from such shaft or drift. A grant or lease of a mining right for coal or ores would create a presumption that this method was understood and intended and that it was expected to cause little interference with the ordinary use of the surface.

This is not true with respect to mineral oil. It lies far below the surface. It can be extracted only by means of wells. Each well is separate from every other and by means of it the oil can be taken only from a limited area of four or five acres immediately surrounding it. For this reason the extraction of oil from the whole of a large tract granted by an ordinary oil lease requires, not one "stock," or one well, as a means of access to the whole deposit of oil, but a separate and independent well upon every few acres of the oil-bearing territory. The tract must be dotted with wells, each as separate and distinct in its installation and operation as if owned by different persons. Consequently, one who leases his land for this purpose necessarily understands and intends that as many wells will be sunk and operated thereon as may be required to raise all the oil in it. His own possession and use of the surface will be substantially as much interfered with by the operation of all these wells under one management as it would be if each well was operated independently by a different person. If his rent is paid by a royalty, as is common, it will be to his advantage to have the oil taken out rapidly and this may often be better done by subletting in tracts to different persons than by keeping it in control of one person or corporation. The conditions are the very opposite of those which support the rule of the Mountjoy case. "When the reason of a rule ceases, so should the rule itself." (Civ. Code, sec. 3510.)

If this is so with respect to an ordinary oil lease upon a royalty, it is much more so in the case of the lease to the

Fearon Oil Company. That company was organized on August 24, 1907, with one million shares of stock, of which only six hundred and fifty-three thousand have been issued. The lease was made twelve days after the company was incorporated. As a consideration for the lease, the company issued to Fearon five hundred and twenty-five thousand shares of its capital stock. The lease constitutes practically all of the property of the company. Fearon owned nearly all of the stock and was in potential control of the company. In practical effect he leased the land to himself. The consideration for the lease was complete and fully paid upon its execution, by the issuance to him of said stock. But his actual profit must come from the dividends to be paid by the company upon that stock. The amount of these dividends would depend upon the number of wells in operation and the quantity of oil taken. It was to his interest to have as many wells in operation as possible. The corporation had no means and could obtain money to develop and extract the oil only by borrowing or by selling some of the treasury stock. It is easily to be seen that it would be greatly to its advantage, and to Fearon's advantage also, to have the power to sublet parcels to others who would extract the oil and pay a rental or royalty.

For these reasons we are of the opinion that the rule of the Mountjoy case is inapplicable, and that the estate of the Fearon Oil Company, whether capable of being justly partitioned between tenants in common or not, could be sublet in smaller parcels to different subtenants. In *Hughes* v. *Devlin,* 23 Cal. 502, the court held that mining claims upon public lands of the United States were corporeal interests in land and, as such, were subject to partition, if owned by tenants in common. The case, in effect, supports our conclusion. In *Smith* v. *Cooley,* 65 Cal. 46, [2 Pac. 880], Smith, being the owner in fee, had granted to Cooley a "mining right" in the undivided one third of the land, and he afterward sued Cooley in partition. The right of Cooley was declared to be an incorporeal hereditament and not capable of partition. The case is distinguishable from an exclusive oil lease upon the grounds heretofore stated.

4. The clause imposing the condition that the lease shall terminate if an assessment be levied on the stock of the Fearon Oil Company provides that upon a breach thereof the lessors

shall have the right to eject from the land "all agents, officers or employees" of said company. Appellants, from the phrase quoted, endeavor to deduce the conclusion that the lessors could not eject any person who was not such agent, officer, or employee and that, therefore, there is an implied covenant against subletting in parcels. The same argument would apply to an assignment or sublease of the whole tract. Without discussion, we think it sufficient to say that in our opinion the conclusion is not justifiable on any allowable theory of interpretation.

5. It is claimed that the lease from the Fearon Oil Company to plaintiffs is void because its execution was not authorized by the lawful board of directors of the company. It runs in the name of the Fearon Oil Company. It is signed by the plaintiffs and by "Fearon Oil Company, by Wm. W. Goldnamer, its secretary." The corporate seal of the company is attached, and the execution was duly acknowledged. A resolution authorizing Goldnamer, as secretary, to execute the lease for the company, purporting to have been adopted by the board of directors of the company was received in evidence.

When the corporate seal is affixed to a contract purporting to be regularly executed for a corporation by one of its officers, the seal is *prima facie* evidence of the authority of the officer to execute the contract for the company. (*Und-·hill* v. *Santa Barbara etc. Co.,* 93 Cal. 314, [28 Pac. 1049] ; *Colton L. & W. Co.* v. *Swartz,* 99 Cal. 284, [33 Pac. 878] ; *Burnett* v. *Lyford,* 93 Cal. 117, [28 Pac. 855] ; *Mills* v. *Boyle M. Co.,* 132 Cal. 97, [64 Pac. 122] ; *Schallard* v. *Eel R. N. Co.,* 70 Cal. 146, [11 Pac. 590] ; *Reed* v. *Clay,* 134 Cal. 213, [66 Pac. 262] ; *Potts Drug Co.* v. *Benedict,* 156 Cal. 327, [25 L. R. A. (N. S.) 609, 104 Pac. 432] ; *McKee* v. *Cunningham,* 2 Cal. App. 687, [84 Pac. 260].)

The defendants assert that the authorization to the secretary, to execute the lease to plaintiff was invalid upon a number of technical grounds. They say the meeting of the directors at which it was authorized was not properly called; that three of the four persons who assumed to act as directors at said meeting were neither directors nor stockholders of the company; that the articles of incorporation limited the number of directors to three persons, that Joseph Fearon, Addison

Fearon, and Wm. W. Goldnamer were thereby appointed and have ever since held and exercised office as such directors; that an attempted increase of the number to seven was illegal because it was made at a stockholders' meeting illegally called and held by persons not stockholders; that the four additional directors thereupon elected,—namely, H. Z. Austin, H. G. Traeger, M. B. Harris, and J. H. Fearon, were not and could not be directors because there were no additional lawful offices of directors to be held or filled; that the only persons present and assuming to act as directors at the meeting were Goldnamer, Austin, Traeger, and Harris, and that Goldnamer alone was a lawful director; and that the by-laws empowered the president to execute the contracts of the company and did not authorize the secretary to do so.

The evidence shows that the meeting of stockholders at which the increase in the number of directors was made was held on December 13, 1907, that the additional directors were elected on the same day, that a certified copy of the amendment to the articles of incorporation declaring such increase in the directorate was duly filed in the offices of the county clerk and secretary of state, and that from December 13, 1907, to the day the lease was authorized, March 6, 1909, these persons continued to act as directors of the company, without objection on the part of any stockholder. At the stockholders' meeting of December 13, 1907, all of the six hundred and fifty-three thousand shares of issued stock were represented either in person or by proxy, except twenty-six hundred shares. Another meeting of stockholders was held on January 11, 1908, which was attended by the holders of stock amounting to 650,800 shares, at which meeting the proceedings of the stockholders' meeting of December 13, 1907, were ratified. There is no merit in the claim that these persons were not stockholders. They held certificates of stock regularly issued. The objection that the consideration for the stock was not lawfully sufficient cannot be raised to invalidate their action when third persons have dealt in good faith upon it.

The persons thus chosen as directors and recognized and permitted to act as such were, at least, *de facto* directors, and their acts were therefore valid, so far as they were acted on in good faith by third persons. "Persons who hold office as directors, or other officers, with the consent of the corporation,

and under color of an election or appointment, are *de facto* officers, although their election or appointment may have been illegal, and their acts as such, in so far as third persons are concerned, are just as valid and binding upon the corporation, as if they were officers *de jure."* (3 Clark & Marshall on Corporations, p. 2035, sec. 6002; *Waterman* v. *Chicago etc. Co.,* 139 Ill. 658, 15 L. R. A. 418 and notes, [32 Am. St. Rep. 228, 29 N. E. 689] ; *Bradford* v. *Frankfort etc. Co.,* 142 Ind. 392, [40 N. E. 741, 41 N. E. 819] ; *San Jose Savings Bank* v. *Sierra L. Co.,* 63 Cal. 180; *Balfour, Guthrie Co.* v. *Woodworth,* 124 Cal. 173, [56 Pac. 891] ; *Barrell* v. *Lake View L. Co.,* 122 Cal. 133, [54 Pac. 594] ; *San Joaquin etc. Co.* v. *Beecher,* 101 Cal. 80, [35 Pac. 349] ; *Sherwood* v. *Wallin,* 154 Cal. 735, [99 Pac. 191].)

Joseph Fearon was a large stockholder in the Fearon Oil Company it is true, but he was also its lessor and as such he stood in the position of a third person to that company, so far as this question is concerned. Defendants have no relation to that company other than that which they had as privies in estate with Joseph Fearon as such lessor. They have no *status* as stockholders and cannot attack the corporate action in that capacity. They are not entitled to act on behalf of that company. The plaintiffs, so far as appears, acted in the honest belief that the persons who authorized the secretary to make the lease were lawful directors. They are therefore protected by the rule above stated against all attacks of the defendants upon the validity of the lease grounded upon the claim that the directors were usurpers. And as to the plaintiffs, the question whether the meeting of directors was a regular meeting or was duly called, is immaterial. (2 Cook on Corporations, secs. 713a, 725.) And so is the objection that the by-laws do not expressly authorize the secretary to sign corporate contracts, but do authorize the president to do so. (2 Cook on Corporations, p. 1825, sec. 725.)

We do not think that the principle that there cannot be a *de facto* officer unless there is a *de jure* office for him to hold, is applicable to this case. The same strictness does not obtain as in the case of public offices which can be created only by law. Stockholders are private persons and are subject to the principle of estoppel by conduct, as such, and in their relation to the corporate affairs, the same as in any other business

matters. They are the human components of the corporation. The statute itself creates the office of director. (Civ. Code, sec. 290.) The number of the directors, in excess of three, is entirely dependent on the will of the majority of the stockholders. They have full power to increase the number. If that majority meets and regularly adopts, certifies, and files in the proper offices, an amendment to the articles of incorpora· tion increasing the number of directors, and then suffers the persons so constituted directors to transact the business of the company without objection, the plainest principles of equity and justice would prevent them, or the corporation in their behalf, from asserting the lack of authority of such board of directors, or a lawful quorum thereof, to do business and make contracts for the corporation. We think the better rule is that the corporation is bound by such conduct to this extent, at least, that a third person may safely deal with the corporation on the faith of such a certificate, regular on its face, and without inquiring whether or not the stockholders had been regularly called to meet at the time the change was made, and that a contract authorized by such board, made by a third person in good faith, with the authorized corporate officers, binds the corporation. The plaintiffs' lease is therefore valid.

6. Appellants contend that the finding that plaintiffs took possession of the land under their lease on March 10, 1909, is not supported by the evidence. There was evidence that they went upon the land on that day and deposited a wagon load of well-drilling tools thereon, intending to bore a well thereon, and that they returned the next day with more tools for that purpose, but were excluded by Joseph Fearon. This was a sufficient entry, if any entry was necessary, to enable them to maintain the action. We do not regard this part of the finding as important, or necessary to the judgment. The plaintiffs were thereafter and ever since excluded from the land by the defendants, and the findings so state. The suit is for the recovery of possession, and to enjoin the defendants from extracting oil therefrom. If the plaintiffs had and have the right of possession, this was sufficient to support the judgment given to the effect that plaintiffs are entitled to the possession of the land for the purpose of drilling wells and taking oil therefrom under their lease from the Fearon Oil Company, and that defendants be enjoined from interfering with plain-

tiffs' work of well-drilling thereon and taking oil therefrom, and that defendants be also enjoined from drilling wells thereon themselves.

There is no merit in the claim that the lease of the Fearon Oil Company to the plaintiffs did not give them any right to the possession of the one hundred and twenty acres. That lease purports to let, demise and lease to plaintiffs, for twenty years, the exclusive right to drill wells on the one hundred and twenty acres and take oil therefrom, the said drilling to begin within ninety days, and to continue with diligence to a depth of twenty-five hundred feet, unless oil was sooner found, and the right to continue thereafter to drill at least eight other wells thereon and to operate the same, the company agreeing to protect the plaintiffs in their possession during the term, and giving them the further right, after the twenty years, to remain in possession of such part of the premises as should be required to enable them to operate all wells thereon that were then producing oil. It also contained a covenant, in favor of plaintiffs, that they should quietly hold and enjoy the premises for the term. The company reserved only the right to enter upon the land to inspect the work done by plaintiffs and the right of Joseph Fearon to reside in the house then on the land and to farm the land not actually used or needed for the business of drilling the wells or removing the oil. This clearly gave the plaintiffs the present right of possession for the purposes specified in the judgment. It vested in them a corporeal interest in the land, an estate for years with right of possession for a limited purpose. (*Frisbie* v. *McClerinan*, 38 Cal. 571; *Gracioso Oil Co.* v. *Santa Barbara Co.*, 155 Cal. 144, [20 L. R. A. (N. S.) 211, 99 Pac. 483]; *Brookshire Oil Co.* v. *Casmalia Oil Co.*, 156 Cal. 215, [103 Pac. 927].) The question whether plaintiffs became the absolute owners of the oil, or had any *title* to it at all before it was raised to the surface, is not material to the case. The issue concerns only the right to the possession of the surface and the right to protect and keep the oil in place while the plaintiffs are engaged in obtaining it as provided in their lease.

7. Certain rulings upon the admission and rejection of evidence are assigned as error. The conclusions reached upon the points hereinbefore discussed disposes of all these objections. They are all based on the propositions advanced by

defendants which we have held to be untenable. We do not deem it advisable to extend this opinion by stating or considering them.

The judgment and order are affirmed.

Angellotti, J., and Sloss, J., concurred.

Hearing in Bank denied.