[Civ. No. 5037. Second Appellate District, Division Two.—February 29, 1928.]

BELLE F. BELL, Respondent, v. CENTRAL BANK OF IMPERIAL VALLEY (a Corporation), Appellant.

Ault & Anderson for Appellant.

Hickcox, Crenshaw & Trude for Respondent.

STEPHENS, J., *pro tem.*—This is an appeal from a judgment for plaintiff in an action for damages for conversion. It is here on a bill of exceptions.

On January 13, 1920, a written lease to a farm in Imperial County for a period of two years from February 1, 1920, was signed by L. L. Sidwell, lessor, and Sucha Singh, lessee, by the terms whereof rental was to be paid as follows: Sixteen hundred dollars down, which was paid; $1,600 on November 15, 1920, December 1, 1920, February 1, 1921, November 15, 1921, and December 1, 1921. The lease provided that a crop mortgage on fifty per cent of the produce should be given to secure the rental. This instrument was assigned on July 20, 1920, to Belle F. Bell, plaintiff and respondent herein. Pursuant to its terms, a crop mortgage was executed upon fifty per cent of the crop to secure the rent. The written lease, mortgage, and necessary affidavit of good faith required by section 2957 of the Civil Code contain the name of Harman Singh as one of the lessees, but he did not sign any of these instruments. The notary's jurat, however, states that both Sucha and Harman Singh appeared before him, etc. The mortgage was recorded March 25, 1920, was

assigned to plaintiff on July 31, 1920, and recorded on September 23, 1920. On May 21, 1920, the lessees above named executed a mortgage on the growing crop to E. S. Judson in the sum of $1,000. This instrument was signed by both Singhs—that is, Harman made a mark which was witnessed by one person only. The necessary affidavit of good faith, etc., was signed in the same way, and the notary's affidavit merely states that both persons "whose names are subscribed" appeared, etc. It appears by the testimony that this mortgage was assigned to plaintiff, although there is nothing in the record before us as to the date of such assignment.

All of the instruments signed by Sucha Singh are in Hindu characters, and as to the chattel mortgages and assignments, appellant contends that they are not signatures as required by law. This objection, however, need not be considered here, as the only objection made in the trial court was as to competency, relevancy and materiality. "When offered in evidence . . . the sole contention [was] . . . that the instrument was incompetent, irrelevant and immaterial. If defendant had desired the exclusion of the instrument upon the ground now for the first time urged [unauthorized signature], it should have made its objection based upon such ground at the time of the trial, when opportunity would have been afforded plaintiff to meet the same." (*French* v. *Atlas Milling Co.*, 17 Cal. App. 226 [119 Pac. 203].)

Appellant also claims that the affidavit of good faith, etc., under section 2957 of the Civil Code, not being signed by Harman Singh, the mortgage of January 13, 1920, is invalid as to the creditor bank; but the lease requiring this mortgage also is not signed by Harman. The findings of the trial court recognize Sucha Singh as the sole tenant of the premises, and as the question resolves itself into one of fact on evidence which is at least conflicting, we shall consider herein that Harman Singh is not a party thereto. The same logically follows as to the first mortgage. In taking this position we are cognizant of those cases which hold that the lessee need not actually sign, and that if he takes possession and acts under the lease he is bound. (*Castro* v. *Gaffey*, 96 Cal. 421 [31 Pac. 363]; *Chandler* v. *Hart*, 161 Cal. 405 [Ann. Cas. 1913B, 1094, 119 Pac. 363]; *Allan* v. *Guar-*

*anty Oil Co.,* 176 Cal. 421 [168 Pac. 884] ; *Watkins* v. *Mc-Cartney,* 57 Cal. App. 643 [207 Pac. 909].)

■ Appellant also claims that the mortgage of May 21, 1920, is void because it is signed by Harman Singh by a mark and witnessed by but one witness instead of two, as required by the code. But Harman was not a party to the lease and had no mortgageable interest therein or in the crop, so that his name and mark are superfluous. Just what relation he bore to the transaction is not very clear. Sucha and Harman were brothers, and were Hindus, and their business transactions, as well as their expressions in testifying, indicate an ignorance of the English language and American business methods. Harman's name appears in connection with that of Sucha, but when formal signing is required, Sucha, except in the instances mentioned, acted alone. We shall therefore consider Sucha as the tenant of the premises.

The cotton crop was harvested by the tenant, and, without objection from respondent, was taken by him from the ground it was raised on and ginned. The compressor receipts acknowledge receipt of the cotton from Sucha Singh, and the bales were identified by the mark "S. H." Sucha testified that these letters meant the initials of himself and brother, but at the same time he treated the bales as his own. The gin operator advanced the picking money. Thereafter Sucha, together with the gin operator, went to the appellant bank, where, upon the tenant's indorsing the compressor receipts and signing a note, the receipts were delivered over to the bank and the gin operator was repaid his advances by the bank. This procedure was repeated three or four different times, until the whole crop of 49 bales had been so treated. The tenant Sucha Singh also owed the bank for advances made the year before on a crop raised on other land.

During February of 1921 respondent offered to pay the picking money with interest to the bank, and demanded delivery to her of the warehouse receipts, claiming a right thereto by virtue of the crop mortgages. The bank refused to comply with the demand, and on August 11, 1921, sold the cotton to the highest bidder and applied the proceeds upon both the old and the new loan. Plaintiff brought suit against the bank in conversion, basing her claim on the crop mortgages. Defendant's principal defense was based upon

section 2972 of the Civil Code, its contention being that the removal of the cotton from the leasehold ground released the crop mortgages. Section 2972 reads as follows:

"The lien of a mortgage on a growing crop continues on the crop after severance, whether remaining in its original state or converted into another product so long as the same remains on the land of the mortgagor."

There is sufficient evidence to support a conclusion that the mortgagee or her agent had talked with the banker about advancing the picking money shortly before picking time; that he told her that he would advance the money upon the cotton compressor or warehouse receipts and that he would like to apply any funds so received from the crop, after payment of picking advances and crop mortgages, to the old bill owing by Sucha Singh. Appellant contends that these conversations were with a Mr. Judson, and that there is not sufficient proof to establish his agency. The banker was personally acquainted with Judson, knew he was the son-in-law of plaintiff, knew the wife of Mr. Judson and talked with both of them on subjects connected with the place on which the cotton grew. Whether or not this constituted a strict agency, we think these conversations can properly be taken into consideration by the court when considering the question as to whether or not the bank was put upon notice by them and that it was the intention of the mortgagee to preserve her mortgage liens. Thereafter the tenant came into the bank with the gin operator, a Mr. Goodwin, and made the arrangement hereinabove recited. Certainly, the conversations with the mortgagee did inform the banker that the crop would be ginned and warehoused, as he was to advance the money on the warehouse receipts. The mortgagee, respondent, did not authorize the ginning or warehousing in the tenant's name. We take it that these circumstances could not have misled the banker. In fact, he was affirmatively, though not formally, notified that the cotton would be ginned while yet under the mortgages. The crop mortgagee in this case, as well as in others found reported in the books, had the right to protect the crop. This she did by arranging credit for picking money and seeing to it that the tenant harvested and hauled the cotton to the gin—a process proper and necessary. If through her carelessness the registration at the compress by the tenant had

misled an innocent purchaser or lender, other legal principles might apply. We conclude that the bank is estopped from denying that the mortgages were effective at the time it took the receipts and ever since. (*Crosby* v. *Fresno Fruit etc. Co.*, 30 Cal. App. 308 [158 Pac. 1070], and cases cited therein; *Moosios* v. *Rusconi*, 37 Cal. App. 471 [174 Pac. 92]; *Campodonico* v. *Santa Maria Bean & Grain Co.*, 86 Cal. App. 339 [260 Pac. 830].) Without specifically reviewing the cases cited by appellant, we note that in every one the crop had been removed in such a way as to result to the prejudice of one entitled to act upon the condition as he found it, and who was not estopped therefrom by knowledge of circumstances excusing the removal.

If the cotton had never been sold, then plaintiff would have been entitled to receive the compressor receipts for the purpose of selling them to pay her mortgages according to their terms; but the cotton was sold before this action was started, and the money was received and retained by the bank. The latter, under the terms of section 3054 of the Civil Code, and as agreed to by both parties in their briefs, could apply money in its hands to extinguish a debt owing it by the owner of the money. If, then, after the mortgage interest is awarded to plaintiff and there is anything left, the bank has legal possession thereof. This is entirely overlooked by the trial court in its findings and judgment. Instead, the whole sum found over and above the picking advances is awarded respondent as damages. The complaint alleges that the cotton has been disposed of and asks relief in damages. It is obvious that in no case in which punitive damages are not asked should the amount of the judgment exceed the full amount which the plaintiff is entitled to receive under the mortgages.

The lease was surrendered by mutual consent at the conclusion of the first year. This would cancel the mortgage given to secure the rental, except for rental payments accrued at the date of surrender, which amounted to $3,200, from which must be deducted $417, credits on some minor transactions. (*Curtis* v. *Arnold*, 43 Cal. App. 97 [184 Pac. 510]; *Wetzler* v. *Patterson*, 73 Cal. App. 527 [238 Pac. 1077].) Three thousand two hundred dollars minus $417 equals $2,783, which, added to the amount of the second mortgage, $1,000, makes a total of $3,783, plus interest.

One-half of the money received from the crop was applicable to the payment of the sum due and owing on the first mortgage and the balance, after this, applicable on the sum owing on the second. The highest value of the cotton between the date of conversion and the date of the trial was $7,772.21. ▉ The trial court took this sum as a basis from which to ascertain the damages, deducting therefrom $2,033.35, the sum due the bank for picking advances as of the date of conversion, when respondent tendered that sum to the bank. This was erroneous. The correct rule is laid down in *Page* v. *Fowler*, 39 Cal. 412, 426, 427 [2 Am. Rep. 462], wherein it is said:

"In other words, the rule deducible from the authorities is that in cases affecting property of a fluctuating value, where exemplary damages are not allowed, the correct measure of damages is the highest market value within a reasonable time after the property was taken, with interest computed from the time such value was estimated. . . . The object of allowing this range at all, . . . is because the owner might, and perhaps would, have obtained the price if he had been allowed to retain the property, and the object will control in fixing the limit allowed for estimating the value. . . . As to the annual products of the soil, which are raised for annual consumption, they are almost universally disposed of by the producers within a few months after they are harvested, and, I may say, invariably consumed, or otherwise disposed of before the next harvest; and in my judgment a longer period than that ought never to be allowed within which to estimate the damages as to such property, at least without some proof that the property would have been retained."

That part of the above quotation beginning, "As to the annual products," should not be considered as a part of the rule. Circumstances may often vary this, but it is nevertheless very persuasive. The evidence shows cotton of the grade here considered valued at 14.94 cents per pound on the date of the conversion, February 10, 1921. On February 14th of the same year it was worth 14.45 cents, and on March 17, 1923, 32.11 cents. This shows great fluctuation, and could not sustain a finding that the cotton was worth 32.11 cents per pound within a reasonable period after conversion. It would be a monstrous doctrine if a plaintiff

in a case like this could delay her action for years and then bring it after she had arrived at the conclusion that the commodity in question had reached its highest market peak and, therefore, nothing could be gained by waiting longer. The damages in this case were assessed through the application of an erroneous rule or method, and since the judgment must be reversed and, after respondent's damages have been cared for, the appellant bank be allowed to retain, in addition to its picking advances, a sum not to exceed the old debt of Sucha Singh, her damages should be estimated by the correct rule.

Judgment reversed.

Works, P. J., and Craig, J., concurred.