## AMERICAN SULPHUR ROYALTY CO. OF TEXAS v. FREEPORT SULPHUR CO. et al. (No. 8654.)*

(Court of Civil Appeals of Texas. Galveston. June 26, 1925. Rehearings Denied Except as to Correction of Opinion Oct. 15, 1925.)

1. **Mines and minerals ⬭54(2)—Covenant for good faith and reasonable diligence in development of mine implied, where contract silent thereon.**

Generally, where a contract for development of a mine is silent as to extent of development, law implies a covenant for good faith and reasonable diligence in development.

2. **Mines and minerals ⬭54(2)—Contract and deed for development of land for sulphur held to imply covenant by sulphur company to develop land for sulphur in good faith and with reasonable diligence.**

Where contract and deed executed in pursuance thereof showed that primary moving consideration for their execution was development of the land for sulphur and payment to owner of anticipated royalties therefrom, *held* that there was an implied covenant on part of sulphur company to develop land for sulphur in good faith and with reasonable diligence; it being immaterial that agreement from which implication arose was evidenced by one or more instruments or, in form, a deed or lease contract.

3. **Equity ⬭56—Equity regards the substance rather than the form of agreements.**

Equity regards the substance rather than the form of agreements.

4. **Covenants ⬭8—Landlord and tenant ⬭45—Generally doctrine of implied covenants applies to both deed or lease contracts.**

Generally doctrine of implied covenants is applied to both deeds or lease contracts.

5. **Mines and minerals ⬭54(2)—Consideration paid for sulphur lands held not to destroy implied covenant to develop mines in good faith and reasonable diligence.**

That sulphur company paid $450,000 for sulphur lands, under contract and deed to pay owner royalties from sulphur production, will not destroy implied covenant on its part to develop land for sulphur in good faith and with reasonable diligence, where such sum was necessary to complete purchase of lands on which owner held options and to reimburse him for

---

⬭For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error granted December 10, 1925.

expenses therein añd for investigating their sulphur-bearing quality, and included reasonable compensation for his services in that regard, and royalties which have accrued and will accrue constituted principal part of consideration for conveyance.

**6. Mines and minerals ⊚⇒54(2)—Contract for development of sulphur lands required to be construed with deed executed in connection therewith.**

Contract for development of sulphur lands and payment of royalties to owner was required to be construed with deed executed in connection therewith, where the two together evidenced intention and agreement of parties.

**7. Mines and minerals ⊚⇒54(2)—Covenant by grantee to work mine with reasonable diligence implied, so that grantor may receive compensation contemplated by both parties.**

Whenever right to extract minerals from land is granted in consideration of a reservation by grantor of a portion of production, law implies a covenant by grantee to work mine in a proper manner and with reasonable diligence, so that grantor may receive compensation which both parties had in contemplation when contract was made.

**8. Mines and minerals ⊚⇒54(2) — Voluntary acts of sulphur company held not to authorize it to cease operations for development of lands for sulphur for an unreasonable length of time to loss and damage of owner.**

That sulphur company, under contract and deed for production of sulphur and payment of royalties to owner on production may not have been required to construct additional plants, which it did for its own advantage and profit, will not authorize it to cease operations for an unreasonable length of time to loss and damage of owner.

**9. Mines and minerals ⊚⇒54(2)—Sulphur company did not have absolute discretion under contract and deed to suspend operations for development of lands for sulphur.**

Contract and deed to develop lands for sulphur and payment of royalties to owner on production held not to vest absolute discretion with sulphur company to suspend operations, provided it acted in good faith, where sulphur company was under an implied covenant to develop lands with reasonable diligence.

**10. Mines and minerals ⊚⇒54(3) — Whether sulphur company breached implied covenant to develop mines in good faith and with reasonable diligence held for jury.**

In action for damages for failure to develop sulphur lands, whether sulphur company breached its implied covenant to develop mines in good faith and with reasonable diligence held for jury.

**11. Trial ⊚⇒142—Court unauthorized to take case from jury, unless ordinary minds unable to differ on conclusion to be drawn from evidence.**

Unless evidence is such that there is no room for ordinary minds to differ on conclusion to be drawn therefrom, court is not authorized to take case from jury.

**12. Mines and minerals ⊚⇒54(3)—Question of damages for failure to develop sulphur lands held for jury.**

In action for damages for failure to develop sulphur lands, there being evidence from which jury could fix, with reasonable certainty, amount of damages sustained by owner if they found that suspension of operations by sulphur company was unreasonable, question of such damages *held* for jury.

**13. Mines and minerals ⊚⇒54(3)—Denial of compensation not justified because no rule for measure of unliquidated damages can be applied which will fix with exactness amount of compensation plaintiff is entitled to receive.**

In action for damages for failure to develop sulphur lands, that no rule for measure of unliquidated damages can be applied, which will fix with exactness amount of compensation owner should receive if sulphur company had breached its contract, will not justify denial of compensation; law requiring only reasonable certainty.

**14. Mines and minerals ⊚⇒54(3)—Measure of damages in action for failure to develop sulphur lands stated.**

In action for damages for failure to develop sulphur lands, measure of damages will be amount which jury finds that owner would have received in royalties if the mines had been operated during time they found operation was unreasonably suspended, with interest at 6 per cent. from date such royalties would have accrued.

**15. Mines and minerals ⊚⇒54(3)—Finding that plaintiff brought suit for damages for failure to develop sulphur lands, believing that sulphur company claimed right to suspend operations only on certain grounds, sustained.**

In action for damages for failure to develop sulphur lands, evidence *held* to sustain finding that plaintiff brought suit believing that only ground on which sulphur company claimed right to suspend operations was that it was under no obligations to plaintiff to continue to produce sulphur, and was only required by its contract to pay plaintiff royalties on such sulphur as it cared to produce, and that such belief was induced by representations of sulphur company which were relied on by plaintiff.

### On Motions for Rehearing.

**16. Estoppel ⊚⇒68(4)—Defendant not estopped to show that suspension of mining operations was not unreasonable by failure to inform plaintiff of all of its defenses.**

In suit for damages for failure to develop sulphur lands, defendant *held* not estopped to show that suspension of mining operations was not unreasonable by failure to inform plaintiff of all their defenses to such suit, where plaintiff lost no right and suffered no detriment thereby.

**17. Evidence ⊚⇒186(6)—Copy of government report, showing amount of sulphur produced and in stock at date thereof, held admissible.**

In suit for damages for failure to develop sulphur lands, evidence of report for publication issued by United States government, show-

ing amount of sulphur produced and in stock at date of report, *held* admissible, where it purported to give data taken from records of Department of Interior, and plaintiff agreed that it should be treated as a copy of the original, duly certified by such department.

Appeal from District Court, Brazoria County; M. S. Munson, Judge.

Action by the American Sulphur Royalty Company of Texas against the Freeport Sulphur Company and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

Presley K. Ewing, of Houston, and W. T. Williams, of Austin, for appellant.

W. T. Andrews, of Stamford, C. P. Northrop, of New York City, A. R. Rucks, of Angleton, and C. R. Wharton, John A. Mobley, Palmer Bradley, Baker, Botts, Parker & Garwood, and Andrews, Streetman, Logue & Mobley, all of Houston, for appellees.

PLEASANTS, C. J. Appellant, the owner of the royalties accruing under the contract, of purchase by which appellee Freeport Sulphur Company acquired title and holds and operates extensive sulphur mines near the city of Freeport in Brazoria county, brought this suit to recover damages from the sulphur company for its failure to develop and operate the sulphur mines in good faith and with reasonable diligence, and to require it to proceed with and continue such development and operation in good faith and with reasonable diligence or surrender its rights in the property. The other appellees were subsidiary organizations of the principal defendant, and were made parties because of their contingent interest in the equitable relief sought by the plaintiff.

The allegations of the petition set up a cause of action based on an implied covenant on the part of the defendant sulphur company to develop and operate the sulphur mines in good faith and with reasonable diligence, a breach of such covenant, and damages resulting therefrom. No further general statement of the allegations of the petition is deemed necessary.

The defendants answered by general demurrer, special exceptions, general denial, and special pleas, the nature of which will be hereinafter indicated.

The cause was tried in the court below with a jury. After hearing the evidence, the trial court instructed the jury to find a verdict in favor of defendants, and, on return of such verdict, rendered judgment accordingly.

The evidence, upon which the claim of implied covenant on the part of the sulphur company to develop and operate the sulphur mines with reasonable diligence and its breach of that covenant is predicated, is thus stated in appellant's brief:

"On November 30, 1911, E. F. Simms sold and agreed to convey to E. P. Swenson and S. A. Swenson, of the firm of S. M. Swenson & Sons, a large quantity of land in Brazoria county, described in an attached Exhibit A, in part represented by stock and in part to be acquired under purchase options, stipulating to convey the same by general warranty deed of even date to George Hamman, in trust for said Swenson & Sons, their nominee or nominees, heirs, executors, or assigns. The contract contained these provisions:

"'III. For all of aforesaid lands and aforesaid stock * * * so sold and agreed to be conveyed by said Simms subject to the royalty provision in paragraph IX hereof, said Swenson & Sons have paid and agreed to pay $450,-000. .* * *

"'VII. As a further consideration for this contract and the performance thereof by said Simms, said Swenson & Sons agreed that they, their heirs, executors, administrators, or assigns, shall within one year from June 1, 1921, erect or cause to be erected and put in operation upon the land mentioned and described in aforesaid Exhibit A a complete plant consisting of one unit in accordance with the process operated at the Union Sulphur Works in Louisiana, under the expired Frasch patent. Such plant shall be located on aforesaid land at such place as said Swenson & Sons, or their heirs, executors, administrators, or assigns, may think best and most expedient.

"'IX. It is further agreed that, upon the development of said property for sulphur, and so long as said property or any part thereof is operated as sulphur-producing property, the operator or operators of said property shall pay to said Simms, his heirs, executors, administrators, or assigns, as royalty, 75 cents per ton for each and every ton of sulphur mined or taken from said property or any part thereof, and in addition thereto shall pay to him or them for the first 200,000 tons of sulphur so mined or taken $1 per ton. This covenant is intended to bind each and every operator mining or taking sulphur from said property or any part thereof, but such operator or operators only. Quarterly settlements covering royalty production shall be made. Said Simms, his heirs, executors, administrators, and assigns, shall have full opportunity from time to time to verify the output of sulphur therefrom and amount of royalty that may be due him, and to visit the property at any time for the purpose, and to be fully advised as to the development thereof.'

"The contract was consummated to the satisfaction of the parties as concerns the sale and purchase of the lands. Simms, on the same day, November 30, 1911, pursuant to the contract, made to George Hamman, trustee, the conveyance stipulated for, which contained this provision:

"'The above-described property is conveyed subject to the royalty upon any and all sulphur that may be mined or produced therefrom, in favor of E. F. Simms, his heirs, executors, administrators, and assigns, save and except to this extent: No royalty is retained except as to such property as lies south and west of the hereinafter mentioned line: [Here follows descriptive location of the line.] The property upon which such royalty is payable, and which property is now transferred subject to such sulphur royalty, lies to the south and west of

the line to be run as above indicated, and the property exempted from such sulphur royalty lies to the north and east of the line so to be established.'

"Simms made two other general warranty deeds, of October 24, 1922, both to Freeport Sulphur Company, for specified tracts of land, each containing this provision:

" 'The land above described is conveyed by the grantor herein with a reserved royalty on all sulphur that may be produced from said land hereafter by the grantee, its successors or assigns, the amount, form, and time of payment of the royalty to be the same as was stipulated to be paid to E. F. Simms by S. M. Swenson & Sons on certain other lands made subject of a certain agreement of date November 30, 1911, between S. M. Swenson & Sons and E. F. Simms, which contract is hereby expressly referred to. It being understood that the royalty herein reserved shall remain and continue a first lien on all the sulphur which may be hereafter produced from said land until such royalty is paid.'

"By mesne conveyances and agreements, the title and interest acquired pursuant to the contract of sale and subsequent deeds, as concerns the sulphur properties in question in which royalties were reserved as aforesaid, became regularly vested in the sulphur company, subject to the obligation on its part to pay the specified reserved royalties to the plaintiff, the royalty company.

"Similarly, by mesne transfers and agreements, the title and interests of the vendors, E. F. Simms and his associates in interest, H. T. Staiti, John Hamman, and George Hamman, under the sale and conveyances pursuant to said contract of purchase by S. M. Swenson & Sons, became vested in the royalty company, with the right to the specified reserved royalties, to be paid to it by the sulphur company.

"The complete plant, consisting of one unit in accordance with the Frasch process, which it was stipulated should be erected and put in operation 'within one year from June 1, 1912,' was erected and put in operation within the specified time, and other plants were later erected and put in operation, four in all, as the demands of the market required, and the property was continuously developed, barring a few days in the early operations, until the shutdown on April 1, 1921, and after resumption of operations, June 2, 1922, until the second shutdown, which was January 22, 1924, and which continued up to the time of the trial. Good business or due diligence required the additional plants. Defendant's manager Jones testified that the primary consideration in constructing them 'was to develop the property in accordance with the demands of the market,' and that 'we endeavored to enlarge our production enough to meet the demand, and in order to do that we had to build more plants as we went along.'

"The production for 1912 and 1913 jointly was 11,140 tons, and for 1914 it was 41,872 tons, but these were preparation periods, and not a criterion of the average capacity of the plant or plants. The production for 1915 was 136,751 tons; 1916, 261,779 tons; 1917, 537,-248 tons; 1918, 420,485 tons; 1919, 314,845 tons; 1920, 280,736 tons; and for the first three months of 1921, prior to the shut-down on April 1st of that year, 155,835 tons. The plants are now substantially the same as they were in 1917–18. The only sulphur property at Freeport is that owned by the sulphur company, Bryan Mound. The production for the quarter immediately preceding the shut-down in 1921, was 54,850 tons, and the royalty $41,-137.50. For the quarters of the next preceding year, 1920, the production in long tons was 280,736 and a fraction (1,550 pounds), and the royalty $210,552.52. After operations were resumed, about June 1, 1922, the production for that year was, in long tons, 160,086 and a fraction (118 pounds), and the royalty $120,064.54, and for the four quarters of the following year, 1923, down to the second shut-down, January 22, 1924, the production in long tons was 345,-489 and a fraction (435 pounds), and the royalty $259,116.90.

"Hamman and Staiti, witnesses for plaintiff, testified to the effect, in substance, that, when the transaction of sale to Swenson & Sons was had, the parties mutually understood that there was a large sulphur field in the land, probably 17,000,000 long tons according to reliable expert estimate, which would be very lucrative if the Frasch process of extraction by steam could be applied, and that the vendors had for a long period, during about five years, expended their time, labor, and money in acquiring the lands, and exploring them through engineers for sulphur, and that the $450,000 purchase price was practically reimbursement to them, if taking into account their services as well as money outlays, aside from some discount benefits they got from the option sellers with the consent of Swenson & Sons, and that they never would have sold to anybody without the royalty reservations, and from them contemplated large benefits and profits, which was the main consideration to them in the transaction.

"On April 1, 1921, without any communication with plaintiff as to how the matter might advantage or disadvantage it, the sulphur company shut down production entirely from the sulphur property in question, and produced no sulphur and paid no royalties on any production for the period from then down to the resumption of operations on June 2, 1922; and, when this shut-down occurred, plaintiff protested and remonstrated with defendant, claiming that the defendant was thereby violating its duty to plaintiff of continuing development of the property, but the defendant refused to recognize any right in plaintiff, and placed its action on the ground, in substance, that its only duty towards plaintiff was to pay it such royalties as should become due from the sulphur the defendant sulphur company might choose to produce, and that it was under no obligation to plaintiff to produce any sulphur at all except as it might choose to do so. The above was shown by the letters and telegrams between the parties at the time. In addition, the president, Swenson, testified, in substance, that defendant's position was that the royalty company was entitled to the royalty on the sulphur produced under the contract; that the sulphur company elected to temporarily stop on April 1, 1923; did not consult royalty company as to whether such was to be done or whether it was willing; never recognized the right in it to a consultation; was handling the business according to their best judgment; with him in New York had a perfect right to shut down; if he had casually met an officer of the

royalty company, would have been glad to talk the situation over with him, but could not have yielded to any protest he might make because they claimed the right to operate this property. 'That was the ground that we put our position on. That was the only ground.' After this position of the sulphur company was indicated by its telegrams and letters, before mentioned, this suit was instituted. In this connection, Staiti, who is now plaintiff's president, and was then its vice president, and who sent the letters and telegrams embodying plaintiff's protest and remonstrance, testified that he was duly authorized as vice president to sign and send them, and that he did rely upon the position taken by the sulphur company in bringing this suit and maintaining it as had been done, and that, in doing so, they had been put to the expense of attorney's fees, and other court costs, in maintaining and carrying on the suit; such expense (without entering into detail) going up into the thousands of dollars."

The books of the defendant company, which were all kept in New York, were not produced upon the trial, though due notice was given defendants to produce all books and papers showing the quantity of sulphur produced from the mines from the beginning of production to the time of the trial, the costs of production, the sales, and the amounts received therefrom. The sulphur company did not plead, nor did it offer any evidence directly showing that sulphur could not have been produced from their mines at a profit during the time they were shut down.

The defendant pleaded at length and in detail its activities in the development of'the mines and the production of sulphur from the time such development began in 1912 until operations were suspended in 1921. The evidence introduced in support of its pleading shows that it expended large sums of money in establishing and operating plants on the property for the production of the sulphur, in organizing necessary auxiliary corporations to supply materials necessary in the operation of the plants, in furnishing terminal facilities and means of transportation of the products of the mines and of supplies for the operation of its plants, and in establishing markets and depots for the sale and distribution of the sulphur in many of the cities of the United States and Europe and other countries. It also spent large sums for a water supply and for electric lights, and for houses for its hundreds of employees. The aggregate amount of all of the expenditures, during the time mentioned, exceeded the sum of $10,000,000.

This evidence shows that, until the shutdown before mentioned, the development of the properties had proceeded with unusual diligence and with marked success, and had proved of great benefit to the town of Freeport and all of the territory in the vicinity of the mines.

That these development expenditures were not made at a loss to the sulphur company,

but in the exercise of good business judgment, and resulted in large gains to the company, is shown by a report made by the company to the New York Stock Exchange on June 18, 1919. This report shows that the net yearly earnings of the company for the years from 1914 to 1918, inclusive, and four months of the year 1919 were as follows:

"For the fiscal year 1914............... $ . 170,058 09
For the fiscal year 1915............... 1,122,231 07
For the fiscal year 1916............... 1,422,299 24
For the fiscal year 1917..:............ 5,707,991 81
For the fiscal year 1918............... 5,936,122 00
For the fiscal year 1919 (4 months)..... 665,206 57

Making a total of..................... $15,023,908 78

"Also for the corresponding period that the dividends paid on the $200,000 capital stock of the sulphur company were:

"Dividend of December 31, 1914.......... $  99,744 91
Dividend of November 30, 1915.......... 200,000 00
Dividend of March 19, 1917............. 1,275,000 00
Dividend of March 30, 1918............. 3,350,000 00
Dividend of May 20, 1918............... 1,000,000 00

Making a total of..................... $6,934,744 91

"Also that for depreciation, the sum of at least 5 per cent. of the total cost of the property was charged off each year."

Aside from its pleaded defenses that no implied covenant to operate the mines in good faith and with reasonable diligence inhered in or could arise from its contract of purchase, and that in any event the question of the extent or continuance of the production of sulphur from the mines was alone for its determination, in the absence of evidence showing bad faith on its part, the only defense offered for the suspension of production was the claim of overproduction and accumulation under existing market conditions. The only witnesses who testified as to these conditions were Mr. Jones, the general manager, and Mr. Swenson, the president of the company.

Jones testified that there was no intention on his part as general manager of the sulphur company, when he gave direction for the first cessation of production, of abandoning the mines, but that the closing down of the mines had been for some time under consideration as a necessity or as a prudent business policy, and his intention was to resume operations and production at a later date. With respect to the present cessation of production at Bryan Mound, he testified it was his intention to resume operations whenever the necessities of the business required, and that he gave directions as to the property, looking to a resumption of operations at a later date, but did not say why the shut-down.

Swenson testified:

"The Freeport Sulphur Company suspended production for a year, from April, 1921, to about June, 1922. I will tell you in a brief way why they suspended sulphur production for that temporary period: We had gotten

ahead of the possibilities of selling sulphur. In other words, we had produced a great deal of sulphur, large stocks, ahead of the demand, and it was a business question, a question of economy in business; the economics of the business would dictate that; an overproduction merely meant putting more money into increased inventory and added property which was very expensive. In other words, if I may elucidate a little bit, if we could sell sulphur as rapidly as we can make it, or thereabouts, it would be a very wonderful business, but, when our production gets to be overloaded, it means a large amount of money tied up in production of that sulphur, the loss of interest on that cost, possible depreciation on its market value, and the rigid taxes which run against us, and in every way it is an inadvisable thing for any corporation—it is common to all producing corporations, whether it is sulphur or woolen or cotton mills makes no difference. In other words, you must have a period to accumulate, and, as heartrending as it is to us to discontinue, it is a necessity of the business once in a while to catch up."

The only additional evidence on this issue was the following report or statement for publication, released by the Department of Interior on March 4, 1924:

"Department of the Interior 16834.

"Memorandum for the Press.

"Released for morning and afternoon papers of March 4, 1924.

" 'Sulphur and Pyrites, 1923.

" 'New Record Production and Shipments of Sulphur.

" ' * * * Stocks which amounted to nearly 2,500,000 long tons at the end of 1922, increased to nearly 2,900,000 tons at the end of 1923, so that if production should cease entirely shipments from stocks could be maintained for nearly 2 years at the rate for 1923, which was the record high rate. * * *' "

In refutation of appellees' claim that the overproduction of sulphur justified the suspensions of operations complained of by appellant, we copy from appellant's brief the following summary of additional facts shown by the evidence:

"It was shown that 85 per cent. of the world's sulphur supply was produced by the appellee sulphur company, the Union Sulphur Company at Union, La., and the Gulf Sulphur Company, at Matagorda, Tex., and that representatives of these three companies had met at London in October, 1922, with the European producers (chiefly Sicilian), and parceled out in a proportion among themselves the sulphur markets of the world except the United States, Canada, and Mexico, on a percentage basis practically equal among them, and that this agreement was being carried out through a corporation, Sulphur Export Corporation. Manager Jones testified that, in competition with the Union and Gulf Companies, in the United States, Canada, and Mexico, the sulphur company was equal in all respects—had the best sulphur, better than either competitor, lots of stacking or storing room for the sulphur produced, ample equipment for handling it, and in arrangements for marketing and selling, agencies and so forth, and in facilities for disposing of it. 'Think we are quite equal.' Jones further testified that he was familiar from statistics with the production of the Union for 16 years, and there was testimony, both of Jones and Swenson, to the effect that, at the times of the shutdowns in question, under the above similarity of conditions for market and sale of sulphur, both the Union and Gulf had on hand, respectively, larger quantities of sulphur than the appellee sulphur company, and there was no evidence that they ceased operations during such shut-downs, or have done so any time since, but the testimony tended to the contrary. Jones testified that he knew the Gulf was operating in 1920, and continued to operate in 1921. Swenson testified that he knew in a general way the Gulf had a very large stock of sulphur, and it was his impression that the Union also had a pretty large stock of sulphur, but did not know how many tons; did not know the Gulf at the time of the shut-down on April 1, 1921, had on hand 700,000 tons of sulphur, but his 'guess would be that they had more,' and that 'we certainly keep posted as to whether our competitors are operating or not.' Asked if he did not know that both the Gulf and Union were operating during the shut-downs in question, and had been ever since, he answered 'I do not know whether the Union Sulphur Company have continuously operated or not,' but was silent as to the Gulf. He further testified, 'I do know, from hearsay, but convincing to me, that both companies have carried larger stocks than we have,' and that he knew of the Union shutting down once, he did not know when, but it was on account of a storm, which the plaintiff adduced testimony showing was in 1915.

"In addition to the above, plaintiff proved that the appellee sulphur company, on March 14, 1922, made a contract in writing with the Texas company of that date, for the development by the former of a sulphur field, known as Hoskins Mound. By such contract the sulphur company became bound to pay when it was not operating $10,000 per month until 1923, and thereafter $15,000 per month; in other words, guaranteed that the minimum should not be less than $10,000 per month. It also by such contract obligated itself, as follows: 'It will, beginning not later than April 1, 1923, use reasonable diligence continuously to produce, and it, when produced, will diligently market sulphur from Hoskins Mound.'

"Further: 'Not less than one-half of all sulphur marketed by the sulphur company or any affiliated company during each fiscal period shall be of sulphur from Hoskins Mound; provided the supply produced or which by reasonable diligence could be produced from Hoskins Mound is adequate to that end.'

"Also, as follows: 'The sulphur company may suspend such production at any time with the consent in writing of the Texas company, or without such consent, should a board of arbitration formed hereunder decide that sound business policy justifies and requires such suspension.'

"The Hoskins Mound was about 15 miles distant from the Bryan Mound, in the same county. The sulphur company began production

from Hoskins Mound March 31, 1923, and from then until January 22, 1924, the date of the second shut-down, it produced .147,425 tons from Hoskins Mound and 317,937 tons (more than twice as much) from Bryan Mound. The first shipments from Hoskins Mound were about January 20 to January 22, 1924. As Manager Jones put it, 'It happened to fall practically coincident with the cessation.' Shipments from that time to the trial were being regularly made from the Hoskins Mound. Swenson, the president, testified that he expected 'to live up to that 50–50 proposition in the contract with the Texas company.' He further testified that he expected the Hoskins Mound to produce as much as the Bryan Mound, and that, if one of the mines produced overaccumulation, two would doubly do so, and that it might come about that they could market the production of one, but have overaccumulation with the two 'under the conditions stated, that would be the inevitable result.' The defendants gave evidence that it was good business for the sulphur company to acquire the development of the Hoskins Mound, in reducing overhead expense and to protect its large investment at 'Freeport, in the event the Bryan Mound should fail. 'The motive in taking it,' as Swenson testified, 'was to benefit the Freeport Company.' "

For the purpose of fixing the measure of plaintiff's damage, it was shown by the testimony of an expert accountant that, on a basis of the average production for the same quarterly periods in preceding years of operation, the royalties accruing to plaintiff if the mines had been operated during the suspension periods would have been $318,777 and the interest at 6 per cent. computed on the quarterly royalties that would have so accrued would amount to the sum of $38,822.77. It was also shown, as before stated, that the estimate of experts as to the quantity of sulphur which was available for mining at the time the sale was made by Simms to Swenson was 17,000,-000 tons. In an application made by the agent of the sulphur company to the New York Stock Exchange on June 18, 1919, it is stated that an accurate estimate of the life of the mines is impossible but that—

"It is thought probably, however, that at the time of commencing mining operations the total sulphur deposits amounted to about 17,000,000 tons, in which case 9 per cent. of the total has been exhausted."

It was further shown that if the quantity of sulphur taken from the mines prior to the ·time of the trial be deducted from the original estimate of 17,000,000 tons, there remained available in the mines 14,444,380 tons, and at the rate of production for 1923, the last year of operation, the mines would last for 40 years.

From this statement of the pleadings and evidence it is apparent that the first question presented for our determination is whether there is an implied covenant on the part of the appellee sulphur company to develop the land for sulphur, in good faith, and with reasonable diligence until it is fully developed.

[1] We see no reason to doubt the applicability to the facts of this case of the long-settled general rule that, where a contract for the development of a mine is silent as to the extent of the development, the law implies a covenant for good faith and reasonable diligence in development. Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396; Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464; Guffey Petroleum Co. v. Oliver (Tex. Civ. App.) 79 S. W. 884; Guffey Petroleum Co. v. Jeff Chaison Townsite Co., 48 Tex. Civ. App. 555, 107 S. W. 609; Bryan's Law of Petroleum and Natural Gas, 215, p. 189; Thornton's Oil and Gas, vol. 1, § 98, p. 155; Munsey v. Marnet Oil & Gas Co. (Tex. Civ. App.) 199 S. W. 686; Harris v. Ohio Oil Co., 57 Ohio St. 118, 48 N. E. 502.

As illustrative of the principle on which such covenant is implied, it is said in the Harris Case, supra:

"On principle, it would seem that there is such implied covenant in the written instrument. When no time is fixed for the performance of a contract, a reasonable time is implied. When a contract for the erection of a house or other structure is silent as to the quality of the materials or workmanship, it is implied that the same should be of reasonable quality. In a lease of a farm for tillage on shares, it is implied that the tenant shall cultivate the farm in the manner usually done by reasonably good farmers. So, under an oil lease which is silent as to the number of wells to be drilled, there is an implied covenant that the lessee shall reasonably develop the lands, and reasonably protect the lines."

It is true that oil and gas, because of their fugitive migratory nature, emphasize the necessity and duty of diligent operation, but the principle is just as applicable to the mining of solid minerals. The loss to the lessor by the failure of the lessee to diligently develop might be greater in oil and gas lands, because such failure might cause the loss of the oil and gas as well as the income from the royalties, whereas in mining solid minerals the loss would only be the income; but the lessor is as clearly entitled to protection in the income derived from his royalties as in the preservation of the material upon which the royalties are based. Benavides v. Hunt, 79 Tex. 383, 15 S. W. 396; Thornton's Oil and Gas (3d Ed.) vol. 1, p. 241.

[2] When the contract between Simms and Swenson and the deed executed in pursuance thereof are considered in the light of the undisputed evidence a most material, if not the primary, moving consideration for their execution was the development of the land for sulphur and the payment to Simms of the anticipated royalties therefrom.

This being the clear understanding and intention of the parties in the execution of the instruments under which the sulphur company secured title to the land, the principle

of implied covenant on the part of the sulphur company to develop the land for sulphur ·in good faith and with reasonable diligence applies in all its force.

[3] The fact that a formal deed of conveyance was executed in compliance with the contract in no way lessens or affects the application of the principle. Equity regards the substance rather than the form of agreements, and it can make no reasonable difference in the application of the principle of implied covenant whether the agreement or contract from which it arises is evidenced by one or more instruments or is in form a deed or lease contract.

[4] As a general rule, this doctrine of implied covenants has been applied alike to both kinds of instruments. In Washburn's Real Property (6th Ed.) vol. 3, § 2369, considering covenants in deeds, the author there says:

"Covenants in deeds are either express, or are implied from certain words and forms of expression made use of in them, to which the law has attached an obligation, although not, by their ordinary import, expressing any contract or agreement."

Again, on the same subject (section 2406), he says:

"There may be both express and implied covenants in a deed, and both be good."

The same author, dealing with leases, in volume 1, § 665, says:

"These covenants are either implied or express, or, what is the same thing, covenants in law or in deed. * * * Implied are such as arise by construction of law from the use of certain terms and forms of expression which are uniformly held to constitute an agreement, though.no express words of covenant or agreement are connected with them."

The following quotations from cases illustrate the application of the doctrine:

"Where, in an agreement for the sale of a business, the purchase money is to be payable by installments contingent on the amount of profits of the business, there is an implied covenant by the purchasers to carry it on." Telegraph Despatch, etc., Co. v. McLean, L. R. 8 Ch. 658.

"An agreement by a lessee that he would at all times and seasons of burning lime supply the lessor and his tenants with lime at a certain price and for certain purposes, implies a covenant by the lessee to burn lime at all such seasons." Shrewsbury v. Gould, 2 B. & Ald. 487.

"An agreement in a lease that the tenant should fold 'his stock of sheep which he should keep on the demised premises,' amounts to a covenant by the tenant to keep a flock of sheep on the premises." Webb v. Plummer, 2 B. & Ald. 746.

The cases cited and relied on by appellee to sustain the contention that the sulphur company is under no implied covenant to diligently develop the land for sulphur, because it holds the fee-simple title under its deed of conveyance from Simms, do not support the contention. In none of the cases cited was it sought to recover damages for breach of an implied covenant to develop, but the suit was for cancellation of the conveyance, on the ground that the failure to develop was a breach of a condition subsequent which entitled the grantor to a forfeiture.

To show what was involved in those cases, and as illustrating their distinction from the instant case, we make the following quotation from one of them (Hynson v. Gulf Production Co. [Tex. Civ. App.] 232 S. W. 873):

"It [the deed] must, we think, be construed as a conveyance to the petroleum company and its assigns of an indefeasible legal title to minerals, if any, in or under the land. That minerals, including oil and gas, are a part of the realty while in place in and under land, and that as such they are subject to sale and conveyance, are not open questions in this state. * * * Appellants insist, however, that, if the title did pass, it was on a condition the law would imply, to wit, that the petroleum company and its assigns would within a reasonable time thereafter discover and develop the minerals in and under the land. * * * It was expressly held by the Supreme Court in Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464, that an undertaking of that kind should not be construed as a condition subsequent, failure to comply with which entitled the grantor to a cancellation of the contract, but should be construed as a covenant, a breach of which entitled the grantor to recover damages he was able to show he thereby suffered."

[5] The further contention of appellee, which we think is equally unsound, is that no covenant to develop the mines can be implied because of the large cash consideration paid by Swenson for the land. As shown by the evidence, before set out, the $450,000 cash paid by Swenson was not the principal or larger part of the consideration moving Simms to part with his ·title to the land. The amount only covered the sums necessary to complete the purchase of lands on which Simms held options, and reimburse him the sums paid by him in securing titles and options on the lands, the expenses incurred in investigating the sulphur-bearing quality of the lands, and a reasonable compensation for his services in this regard. It was clearly in the contemplation of both parties to the contract of sale that, if the process of mining the sulphur, which the contract provided should be tested by the grantee within the year following the date ·of the contract, should prove successful, the royalties stipulated in the contract would greatly exceed the cash consideration paid for the conveyance of the land. This expectation of the parties was fully realized, and the record discloses that the royalties which have accrued and which will accrue if the mines are

diligently operated, constitute the principal part of the consideration for the conveyance.

It seems wholly illogical to our minds to hold that, because a part of the consideration for the contract was paid, no covenant will be implied to protect the grantor in the payment of the remainder, especially when, as in this case, the unpaid part is the principal and profitable part of the consideration. None of the cases cited by appellee sustain this contention.

The question of the right of a grantor to protection in the payment of royalties reserved in his contract of lease or sale by the application of the principle of an implied covenant to develop the land was not involved in any of them. All that the case first cited (Chandler v. Hart, 161 Cal. 405, 119 P. 516, Ann. Cas. 1913B, 1094) decides is that, where the full consideration stated in the lease or deed is paid in advance, the failure to develop the land for oil will not entitle the grantor to a forfeiture of the lease.

The Texas case cited (Griffin v. Bell [Tex. Civ. App.] 202 S. W. 1034) is, if possible, less in point. It involved no question of implied covenant, and only decides that the instrument in question in that case was not a lease of land or minerals but a contract for the sale and purchase of an exclusive privilege of developing the mineral resources of the land, that the contract was supported by a sufficient consideration, and should not be canceled on any of the grounds urged by the plaintiff in the suit. The opinion in the other case cited is equally inapplicable to the question here involved.

There is no contention on the part of appellant that the contract between Simms and Swenson was not a contract for the sale and purchase of land, nor that the deeds executed in pursuance thereof did not fully and completely vest in Swenson title in fee to the land, and no claim of forfeiture for breach of a condition subsequent is asserted.

[6] We find no ambiguity or uncertainty in the contract which must be construed with the deed; the two together evidencing the intention and agreement of the parties. Sledge v. Stolz, 41 Cal. App. 209, 182 P. 344. When so construed, we think it clear that a covenant on the part of appellee sulphur company to develop the mines with reasonable diligence is implied.

The contract expressly provides for the quarterly payment of royalties, and this necessarily implies the operation of the mines. The extent of the preliminary operations to test the mining process mentioned in the contract is expressly provided for, but the contract is silent as to further operation, and the extent of such operation and development is left to the implication which necessarily arises in the absence of express stipulation, that further prosecution of the work of development should be such as would be reasonably calculated to best effectuate the controlling intention of the parties as shown by the terms of the contract, which was the production of sulphur from the lands for their mutual benefit and profit.

[7] Whenever the right to extract minerals from land is granted in consideration of a reservation by the grantor of a portion of the production, or a promise on the part of the grantee to pay a stipulated sum for each pound, ton, or other fixed measure for determining the amount of production, the law implies a covenant on the part of the grantee to work the mine in a proper manner and with reasonable diligence, so that the grantor may receive the compensation which both parties had in contemplation when the contract was made.

The cases before cited fully sustain these conclusions, and to our previous citations we here add the cases of Emery v. League, 31 Tex. Civ. App. 474, 72 S. W. 603, Brewster v. Lanyon Zinc Co., 140 F. 801, 72 C. C. A. 213, Koch's Appeal, 93 Pa. 434, Wilmore Coal Co. v. Brown (C. C.) 147 F. 931, and Sharp v. Behr (C. C.) 117 F. 864, as closely in point on all of the questions above decided.

[8] The cases cited also sustain the conclusion that the provisions in the contract for the installment of the one unit test plant do not prevent the application of the principle of an implied covenant to continue to develop the land with reasonable diligence if the test plant should prove successful.

It seems to us, however, that this question is not in the case. It would be an unreasonable construction of the contract to hold that the parties intended that, if the process of mining the sulphur, for a test of which the contract provided, should prove successful, no further development of the mine should be required when the capacity of the test plant could not have exhausted in 100 years the sulphur which both parties then believed, and which it is reasonably inferable from the evidence was available for mining from the land. If, however, such construction be given the contract, and appellee was not required to construct additional plants, the facts remain that it did construct other plants and operated them with marked success and large profits for itself and appellees up to the time of the suspension of operations complained of in this suit. It certainly cannot be held that, because appellee may not have been required to construct the additional plants which it did for its own advantage and profit, it can now entirely cease operations for an unreasonable length of time to the loss and damage of appellant.

We will now consider the question of whether the suspension of operations was a matter wholly within the discretion of appellee, provided it acted in good faith.

[9] To hold that the lessee of mining property is vested with absolute discretion as to the extent of development and of diligence in operation would in effect destroy the prin-

ciple of an implied covenant to exercise reasonable diligence in this regard, and would be entirely inconsistent with the cases cited which have applied that principle.

None of the cases from this state, cited by appellee, sustain the contention that an unreasonable suspension of operations in the development of mining property would not entitle the lessor to recover damages caused him thereby when the lessee, as in this case, was under an implied covenant to develop with reasonable diligence. No contention is made in this case that appellee could not at its discretion suspend operations for a reasonable time.

When the covenant for good faith is considered with that for reasonable diligence, it must be given a broader meaning than fraud or intentional bad faith, and be understood as requiring a reasonable regard for the rights of the lessor, and is in effect nothing more than a requirement to use reasonable diligence in the development of the property. Good faith requires a due regard for the mutual interest of the parties, and, if the suspension of operations, while not injurious to the lessee, is unnecessary to protect him from loss, and causes loss to the lessor, such suspension cannot be held to have been made in good faith as to the mutual interest of the parties.

If the question can be considered as an open one in this state, we think the case of Brewster v. Lanyon Zinc Co., supra, announces the correct doctrine. The court in that case, after reviewing the authorities on the question, states that the great weight of authority is against those decisions which leaves the extent of operations to be discretion of the lessee, and says:

"With great deference to the able courts which have adopted this view, we think it is not sound. In the absence of some stipulation to that effect, we think an oil and gas lease cannot be said to make the lessee the arbiter of the extent to which, or the diligence with which, the exploration and development shall proceed. * * * The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. * * * There can therefore be a breach of the covenant for the exercise of reasonable diligence, though the lessee be not guilty of fraud or bad faith."

[10, 11] This brings us to the question of whether the evidence was sufficient to raise the issue of a breach by the sulphur company of its implied covenant to develop the mines in good faith and with reasonable diligence. We think the evidence before set out was sufficient to raise this issue, and the question should not have been taken from the jury. We shall not discuss the evidence in detail nor express an opinion upon its weight and preponderance as a whole, but, in view of the established rule of decision in this state, that, unless the evidence is such that there is no room for ordinary minds to differ on the conclusion to be drawn therefrom, the court is not authorized to take the case from the jury, we think it clear that there was evidence which raised this issue, and that the trial court erred in instructing the jury to return a verdict for the defendants. Lee v. Ry., 89 Tex. 583, 36 S. W. 63; Choate v. Ry. Co., 90 Tex. 88, 36 S. W. 247, 37 S. W. 319; Id., 91 Tex. 409, 44 S. W. 69.

[12] We also think there was evidence from which the jury could have fixed with reasonable certainty the amount of damages sustained by plaintiff, in the event they found that the suspension of operations by the sulphur company was to any extent unreasonable.

[13, 14] No rule for the measure of unliquidated damages can be applied which will fix with exactness the amount of compensation appellant should receive if the sulphur company had breached its contract, but this fact will not justify denying it any compensation. All that the law requires in such cases is reasonable certainty. We think this requirement will be met by making the measure of damage in the case the amount which the jury finds the appellant would have received in royalties if the mines had been operated during the time they find operation was unreasonably suspended, with interest at 6 per cent. from the date such royalties would have accrued.

There is much plausibility in appellee's contention, which finds support in the case of Grass v. Big Creek Co., 75 W. Va. 719, 84 S. E. 750, L. R. A. 1915E, 1057, that the truest measure of damage in a case of this kind would be interest on the amount of royalties the appellant would have received if there had been no unreasonable suspension of operations, for the reason that the sulphur remains available, and appellant will eventually receive the royalties stipulated in the contract.

After due consideration we have reached the conclusion that the rule fixed by the great weight of authority should apply.

If the interest rule should be adopted in order to obtain full compensation thereby, the whole amount of interest appellant would lose by the unreasonable suspension of operations should be allowed. It is plain that interest on the amount of royalties that would have accrued during the time of unreasonable suspension of operations up to the time of the trial would cover only a small part of the interest lost by appellant, because, when operations are resumed, the royalties therefrom will be long past due, and the interest which appellant would be entitled to receive thereon would never be received, and this would be true as to all subsequent royalties until the exhaustion of the mines. Appellant presents

figures based on the continued estimated production of the mines and the time of their exhaustion, which shows that the present value of this lost interest would exceed the sum of the royalties lost by the suspension and interest thereon up to the date of trial. These figures appear to us to be correct, but, be this as to may, we think the safe rule for compensation is that first stated, which is supported by the great weight of authority. Ammons v. South Penn. Oil Co., 47 W. Va. 610, 35 S. E. 1004; Bradford Oil Co. v. Blair, 113 Pa. 83, 4 A. 218, 57 Am. Rep. 442; Daughetee v. Ohio Oil Co., 151 Ill. App. 102, 109, 110; Id., 181 Ill. App. 135; and Id., 263 Ill. 518, 105 N. E. 308.

Appellant objected on the trial to the introduction in evidence of the report for publication issued by the United State government, showing the amount of sulphur produced and in stock at the date of the report, which we have before set out. No objection was made as to the verity of the copy of the report offered; the objection being that the original instrument was "incompetent hearsay." We think the report was admissible under the general rule of evidence relating to the admissibility of public records and documents.

Appellant's seventh proposition is as follows:

"The court was in error in peremptorily instructing the jury to find for the defendants, because the undisputed evidence conclusively showed, or if not, as matter of fact for the jury, that, before this suit was brought, the sulphur company, on complaint from plaintiff of its suspension of sulphur operations, placed its action upon the sole and only ground and reason, as substantially stated by it, that it was under no duty or obligation to plaintiff to continue such sulphur production, but only to pay its royalties on such sulphur as it chose to produce, thereby repudiating the implied covenant on its part towards plaintiff, and that plaintiff was induced in reliance thereon to bring and maintain this suit at cost and expense to it for lawyers' fees and otherwise, so that the sulphur company became estopped to excuse or justify its action on any other ground than that then maintained."

[15] We have set out above the evidence on which this proposition is based, and which is, we think, clearly sufficient to sustain a finding that appellant brought this suit, believing that the only ground upon which the sulphur company claimed the right to suspend operation of the mines was that it was under no obligations to appellant to continue to produce sulphur, and was only required by its contract to pay appellant the royalties on such sulphur as it cared to produce, and that this belief was induced by representations of the sulphur company, which were relied on by the appellant.

Without discussing this question at length or citing authorities, to do which would appreciably extend an opinion already unneces-

sarily long, we will content ourselves with a brief statement of our conclusions on the question.

It seems to us that every element of estoppel is presented by this evidence in so far as appellant's right to recover expenses incurred by it prior to the filing of the sulphur company's answer setting up other grounds of defense, or the receipt by the appellant of other reliable information that the sulphur company claimed that the suspension was not unreasonable, and would make this defense.

The facts upon which the sulphur company relies to justify the suspension on the ground that it was reasonable were solely within its knowledge, and, if this information was withheld when the inquiry was made by appellant and the suspension placed solely on a different ground, we think appellant would be entitled to recover as damages such expenses as it pleaded and proved were incurred by it prior to its being informed of the sulphur company's change of ground. We do not think, however, it should be held estopped to show in this suit, if it can, that the suspension was not unreasonable and thus defeat appellant's claim for damages therefor. Without citing the authorities on the question relied on by the appellant and the appellees, we have in the above holding adopted a middle ground between the opposing contentions, which we think is sound.

This disposes of all the material questions presented by appellant's brief. From our conclusions, before cited, it follows that the judgment should be reversed, and the cause remanded, and it has been so ordered.

Reversed and remanded.

### On Motions for Rehearing.

Appellees have filed a motion for rehearing in which they complain of all of the conclusions expressed in our original opinion upon which our judgment of reversal is based. No new argument is made, and no facts or authorities presented, which were not before us when we decided the case, and we feel constrained to adhere to all of our original conclusions complained of in the motion except the holding, in substance, that, the sulphur company having made representations to appellant which induced it to believe that the only ground upon which it claimed the right to suspend operations of the mines was the lack of any obligation on its part to operate them, and appellant having brought this suit in reliance upon such representations, the sulphur company would be estopped to offer any other defense to a claim by appellant for costs and expenses incurred in bringing the suit. This holding was not well considered, and should be withdrawn. As it is expressed in our original opinion, the holding indicates confusion of thought on the issue of estoppel presented by the record. The question of appellant's right to recover the costs and expenses incurred by it, caused by its reliance

upon the representations of the sulphur company, is not presented by any pleading, and, if the principle on which the holding is based is abstractly sound, it has no application in this case.

Appellant has also filed a motion for rehearing, in which it very earnestly insists that we erred in not holding that the evidence raised the issue of estoppel against appellees to set up any defense or excuse for failure of the sulphur company to operate the mines other then the justification or excuse given by it to appellant prior to the institution of the suit.

As stated in our original opinion, the evidence amply justifies a finding that the only reason given appellant by the sulphur company prior to the institution of this suit for its suspension of operations was that before stated, and that, when appellant brought this suit and incurred the expenses incident thereto, it believed that the only defense appellees would present to appellant's claim was that the sulphur company was not obligated by its contract to use any diligence in the development and operation of the mines.

The doctrine upon which appellant's contention is based is thus broadly stated in 21 Corpus Juris, p. 1222:

"Where a party gives a reason for his decision and conduct touching anything involved in a controversy, he is estopped after litigation has been begun from changing his ground and putting his conduct on another and different consideration."

Many cases are cited in support of this text. The leading case is Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693. This suit, which was tried in Missouri, was one against the railway company for damages for negligence, carelessness, and delay in the shipment of cattle. The cattle were shipped from St. Louis to Philadelphia, under a through contract, which contained no limitation upon the obligation of the initial carrier, the defendant in the suit, to safely transport and deliver the cattle at the point of destination named in the contract. One of the delays in the shipment, which contributed to the damages claimed, occurred at Parkersburg, W. Va. The shipment reached this place and was tendered to the connecting carrier, the Baltimore & Ohio Railway Company, on Saturday, but was not forwarded to its destination until the following Monday. The agent of the plaintiff, who accompanied the shipment, insisted that the cattle should be sent on their way to destination on Sunday morning, but the railway refused this request on the ground that it did not have cars in which to transport the cattle, and, in the language of the Supreme Court:

"It was expressly proved [on the trial] that the Baltimore Company 'was not able to send the cattle out of Parkersburg on Sunday, because they had not the necessary cars there-

for at the time, and that they were sent at the first opportunity, which was on Monday morning.'"

The opinion further states that—

"The evidence set forth in the bill of exceptions is wholly silent as to any other reason for not making the shipment on Sunday."

Upon this statement of the record it is· clear that the Sunday law of West Virginia was not presented in the court below as a defense to plaintiff's claim for damages occasioned by the delay at Parkersburg.· The point was made, however, in the Supreme Court, that the defendant should not be held liable for damages caused by the refusal to ship the cattle on Sunday, and, in support of this contention, a West Virginia statute is cited. In answer to this contention, the Supreme Court says:

"The question made by the company upon the Sunday law of West Virginia does not, in our view, arise in this case. We have already shown that the defendant proved upon the trial that it was impossible to forward the cattle on Sunday, for want of cars. And it is fairly to be presumed that no other reason was given for the refusal at that time. It does not appear that anything was then said as to the illegality of such a shipment on the Sabbath. This point was an afterthought, suggested by the pressure and exigencies of the case. Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not` permitted thus to mend his hold. He is estopped from doing it by a settled principle of law."

It seems to us that the record in the case cited only called for the application of the general and long-recognized rule that no defense which, if available, should have been presented in the trial court, can be presented for the first time in the appellate court, and the broad rule of estoppel stated in that case was inapplicable.

[16] One of the essential elements of an equitable estoppel is lacking in that case, as it is in the case before us. Appellant lost no right and suffered no detriment by the failure of appellees to inform it of all of their defenses to this suit, and it would be inequitable and unjust to refuse to permit appellees to present any valid defense they may have to appellant's claim. The so-called rule of estoppel invoked by appellant, it seems to us, is but an arbitrary rule of decision, which has not obtained in the courts of this state, and which we cannot think should be applied in this case.

[17] Appellant further complains of our holding upon the question of the admissibility in evidence of the report for publication issued by the Department of the Interior of the United States government. We think the report purports to give data taken from the rec-

ords of the department, and, appellant having agreed, as shown by the bill of exceptions, that the paper offered "should be treated as a copy of the original, duly certified by the Department of the Interior," it should be considered as a certified copy of a record of the department, made by a proper officer of the department.

The statement is made in our opinion that—

"No contention is made in this case that appellees could not at their discretion suspend operations for a reasonable time."

If this statement be considered disconnected from the context of the opinion, it is inaccurate and might be misleading, but, when read with its proper context, it is, we think, clear that we did not intend to hold that there could be any suspension of operations inconsistent with the exercise by the sulphur company of reasonable diligence and good faith in the development and operation of the mines.

Our conclusion as to the measure of the obligation of the sulphur company under its contract with appellant is, we think, fully stated in our opinion, and need not be restated.

Both motions for rehearing are ordered refused.